778 So.2d 557 (2001)
Eugene C. LATOUR, II, Clyde LaFleur and Joseph L. Lachney, Jr.
v.
STATE of Louisiana; Honorable M.J. "Mike" Foster, Governor; Richard P. Ieyoub, Attorney General; William R. "Rut" Whittington, Superintendent, State Police.
No. 2000-CA-1176.
Supreme Court of Louisiana.
January 29, 2001.
Richard P. Ieyoub, Attorney General, Cheney C. Joseph, Jr., Baton Rouge, L. Rand Dennis, Counsel for Appellant.
Anthony Craig Dupre, Ville Platte, Christopher Gerard Young, Metairie, Counsel for Appellee.
JOHNSON, Justice
The district court found that La. R.S. 47:9025(B)(2) and 47:9070, which prohibit the sale or purchase of lottery tickets to persons under twenty-one years of age, and La. R.S. 27:319, which prohibits the playing or operating of video poker devices by persons under twenty-one years of age, violate La. Const. art. I § 3. The State suspensively appealed that judgment to this court pursuant to La. Const. Art. V, § 5(D). We conclude that these statutes are not arbitrary or unreasonable because they are substantially related to the protection of the general welfare of this state. Accordingly, we reverse the district court's ruling that La. R.S. 47:9025(B)(2), 47:9070, and 27:319 are unconstitutional.

*558 FACTS AND PROCEDURAL HISTORY
On February 27, 1999, plaintiff, Eugene Latour, II attempted to play video poker at an establishment named "Gators" located in Ville Platte, Louisiana in Evangeline Parish. Gators is owned and operated by plaintiff, Joseph Lachney. Lachney informed Latour that he was prohibited from operating the video poker device because he was under twenty-one years of age. On that same date, Latour entered C & G Junction convenience store. The store is owned by plaintiff, Clyde Lafleur and is also located in Ville Platte. Latour attempted to purchase a Louisiana Lottery ticket, but, again, he was refused because of his age.
On March 9, 1999, plaintiffs filed a class action suit against the State of Louisiana, its governor, attorney general, and state police superintendent on behalf of two groups of plaintiffs: (1) all persons between the ages of eighteen and twenty who wish to purchase lottery tickets and/or play or operate video poker devices in Louisiana; and (2) all Louisiana lottery retailers and video poker licensees who wish to allow persons between the ages of eighteen and twenty to buy lottery tickets and/or play or operate video poker devices.[1] Plaintiffs sought a declaratory judgment, asserting that La. R.S. 47:9025(B)(2) and 47:9070, which prohibit the sale or purchase of lottery tickets to persons under twenty-one years of age, and La. R.S. 27:319, which prohibits the playing or operating of video poker devices by persons under twenty-one years of age, are unconstitutional because they discriminate against adult citizens between the ages of eighteen and twenty. Plaintiffs also sought to enjoin defendants from enforcing the statutes.
Following a hearing, the district court granted a temporary restraining order and enjoined enforcement of the statutes pending a hearing on the issuance of a preliminary injunction. The following day, the district court granted defendants a suspensive appeal to this court from the granting of the temporary restraining order. This court found that there was no basis for the exercise of its appellate jurisdiction and ordered the matter transferred to the court of appeal for its consideration. See Latour v. State, 99-0712 (La.3/18/99), ___ So.2d ___. The Court of Appeal vacated the temporary restraining order and remanded the matter to the district court for further proceedings. Latour v. State, 99-0374 (La.App. 3 Cir. 6/2/99), 741 So.2d 819.
Following a hearing on the preliminary injunction and permanent injunction,[2] the district court declared La. R.S. 47:9025(B)(2), 47:9070, and 27:319 unconstitutional. The district court found that the statutes violate La. Const. Art. I, § 3, which specifically prohibits laws which "arbitrarily, capriciously, or unreasonably discriminate against a person because of ... age...." The district court also issued a permanent injunction, enjoining enforcement of the statutes on a statewide basis.
The State filed a suspensive appeal directly with this court under La. Const. Art. V, § 5(D).[3] Subsequently, the State filed a Peremptory Exception of No Right and No Cause of Action, arguing that Latour and Lachney lack standing to challenge the constitutionality of La. R.S. 27:319.

*559 DISCUSSION

No Right of Action/No Cause of Action
The State objects to plaintiffs Eugene Latour, II and Joseph Lachney, Jr. contesting the constitutionality of La. R.S. 27:319, the statute which makes it unlawful for any person licensed to operate video poker devices to allow persons under the age of twenty-one play or operate a video poker device.[4] The State specifically alleges that Latour has no interest in this suit because he is not a person under the age of twenty-one years of age and, therefore, is not affected by the statute at issue. The State also asserts that Lachney has no standing to challenge the constitutionality of the statute because he does not hold a license to operate video poker devices in a retail business open to the public located in Evangeline Parish.
Plaintiffs' original petition for declaratory and injunctive relief alleges that Latour was born on February 8, 1979. Plaintiffs contended that on February 27, 1999, a convenience store clerk refused to sell him a lottery ticket because he was not twenty-one years of age. Plaintiffs further alleged that Latour would fairly and adequately *560 protect the interests of "all persons between the ages of eighteen and twenty-one years of age who wish to purchase lottery tickets and/or play or operate video poker devices in Louisiana...." Plaintiffs also alleged that Joseph Lachney, Jr. "holds a license to operate video poker devices under Louisiana law, and operates a retail business open to the public located in ... Evangeline Parish ... and provides video poker devices for use by the general public." In a November 1996 election, the electorate in Evangeline Parish (along with the electorate in thirty-two other parishes statewide) voted "No" to the continued operation of video poker devices.[5] Consequently, as of July 1, 1999, video draw poker devices are no longer allowed in Evangeline Parish.
Louisiana law provides that an action can be brought only by a person having a real and actual interest which he asserts. LSA-C.C.P. art. 681. A person can challenge the constitutionality of a statute only if the statute seriously affects his or her rights. Louisiana Paddle-wheels v. Louisiana Riverboat Gaming Com'n, 94-2015 (La.11/30/94), 646 So.2d 885.
In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the United States Supreme Court was presented with the issue of whether a case is rendered moot when a condition which existed at the commencement of the litigation no longer exists. The defendants in that case argued that plaintiff, Jane Roe, was no longer pregnant, and therefore, lacked standing because she no longer had a personal stake in the outcome of the controversy. In response to the defendants' argument, the Court stated:
The usual rule in federal cases is that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated. [citations omitted]. But when, as here, pregnancy is a significant fact in the litigation, the normal 266-day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete. If that termination makes a case moot, pregnancy litigation seldom will survive much beyond the trial stage, and appellate review will be effectively denied. Our law should not be that rigid.... We, therefore, agree with the District Court that Jane Roe had standing to undertake this litigation, that she presented a justiciable controversy, and that the termination of her 1970 pregnancy has not rendered her case moot.
Id. at 125, 93 S.Ct. 705.
In the instant matter, at the time Latour undertook this litigation, he was twenty years of age. This case has been in the litigation process for nearly two years, and it would be an injustice to deny appellate review of a decision which affected him and members of the class he represents at the time the suit commenced. Hence, we find that, at the time Latour undertook this lawsuit, he had a real and actual interest it, and reaching the age of twenty-one has not rendered his cause of action moot.[6] *561 Constitutionality of La. R.S. 47:9025, 47:9070 and 27:319
During the First Extraordinary Session of 1998, the Louisiana Legislature passed Act 146 of 1998, which amended and reenacted La. R.S. 47:9025, 47:9070, and 27:319, raising the minimum age to operate video poker devices and purchase lottery tickets from eighteen to twenty-one in this state.[7] La. R.S. 47:9025 and 47:9070 impose penalties for selling lottery tickets to persons under the age of twenty-one and for persons under the age of twenty-one who purchase lottery tickets. La. R.S. 27:319 penalizes persons under the age of twenty-one who operate video poker devices and persons who allow persons under the age of twenty-one to operate video poker devices.
Plaintiffs allege that the statutes at issue violate La. Const. Art. I, § 3, which provides, in pertinent part:
No person shall be denied the equal protection of the laws. No law shall *562 discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations....
Plaintiffs contend that La. R.S. 47:9025(B)(2), 47:9070, and 27:319 are unconstitutional because they arbitrarily, capriciously, and/or unreasonably discriminate on the basis of age in violation of Art. I, § 3, by prohibiting eighteen, nineteen, and twenty year old adults citizens from purchasing or being sold lottery tickets and from operating or being allowed to operate video poker devices. Plaintiffs argue that the state failed to meet its burden of proving that the discriminating legislation substantially furthers an important governmental objective.
Since 1879, the Louisiana Constitution has declared gambling to be a "vice," and the legislature has been directed to enact laws for its suppression. La. Const. of 1879, art. 172. The Constitutions of 1898, 1913, and 1921 all contained similar provisions regarding gambling. See La. Const. of 1921, art. 19 § 8; La. Const. of 1913, arts. 178, 188, 189; La. Const. of 1898, arts. 178, 188, 189. In order to understand the reasons for this constitutional prohibition, we must look at the history of gambling in this State and the negative connotations associated with the industry.
Historically, gambling has been recognized as a vice activity that poses a threat to public health and morals. The State of Louisiana outlawed gambling in 1812, but, due to financial considerations, New Orleans received a special dispensation that allowed gambling to continue. In 1866, a constitutional amendment was passed which allowed the Louisiana Lottery Corporation, a private company, to form. By 1890, the Lottery was generating $28 million a year. Timothy L. O'Brien, Bad Debt: The Inside Story of the Glamour, Glitz, and Danger of America's Gambling Industry, 107 (Random House 1998). The first waterworks in New Orleans was paid for with Lottery proceeds, and the New Orleans charity hospital was supported with these fund. Additionally, proceeds from the lottery was used to upgrade public schools. Stephanie A. Martz, Note: Legalized Gambling and Public Corruption: Removing the Incentive to Act Corruptly, or, Teaching an Old Dog New Tricks, 13 J. of Law & Politics 453, 459 (1997).
With the boom of the petrochemical industry during the 1970s and early 1980s, the state's economy was revitalized, and there was no longer a need for gambling proceeds to fund government projects. Id. However, the bottom fell out of the oil industry, and the state's economy went into a tailspin. The state legislature turned to legalized gambling to balance the budget. Id.
The only obstacle to legalizing gambling was the Louisiana Constitution of 1974, which followed the language of its predecessors with the provision in Article XII, § 6(B) that, "[g]ambling shall be defined by and suppressed by the legislature." Rather than attempting to remove the constitutional mandate to suppress "gambling", the legislature passed four acts providing for the licensing of "gaming", at a land-based casino in New Orleans, on cruiseships operating out of New Orleans, on riverboats operating on designated rivers in the state, and by means of video poker machines located throughout the state.[8] In providing for gaming activities, *563 the legislature found and declared to be the public policy of this state that "the development of a controlled gaming industry is important to the development of the economy of the state of Louisiana in that it will assist in the continuing growth of the tourism industry and thus will benefit the general welfare of our citizens." La. R.S. 4:602(B), redesignated as, La. R.S. 27:202(B)(1).
This Court upheld the constitutionality of the legislature's enactments providing for legalized gaming in Polk v. Edwards, 626 So.2d 1128 (La.8/20/93). In Polk, we concluded that the legislative enactments were not prohibited by the Constitution as local or special laws contrary to La. Const. art. Ill, § 12, nor were they violative of the admonition in La. Const. art. XII, § 6(B) that the legislature "define" and "suppress" gambling. In reaching these conclusions, we recognized that gambling laws do not constitute local or special laws because "the acts were adopted to benefit the entire state rather than in the interest alone of the Parish of Orleans or particular private individuals, [and] gambling constitutes a matter of legitimate state-wide concern and is rightfully amenable to regulation by the legislature pursuant to the state's police power." Polk, at 1136. Further, the jurisprudence has consistently recognized that "[d]efining and prescribing means of suppression are left to the state Legislature and legislative determination in this regard constitutes an appropriate exercise of police power for the protection of the public." Id., at 1137, citing Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515, 521 (La.1983).
Polk also states that despite the purported barrier to gambling in the Constitutions of 1898, 1913, and 1921, "this Court has consistently recognized that the provision regarding gambling is neither prohibitory nor self-executing. Thus, in the absence of legislative action, `gambling' has been permitted and indeed licensed, notwithstanding the constitutional provision." Polk, at 1138, citing, Shreveport v. Maloney, 107 La. 193, 31 So. 702 (1902); Gandolfo v. Louisiana State Racing Comm'n, 227 La. 45, 78 So.2d 504, 514 (1954). Gandolfo, which recognized that gambling would not be prohibited, and was not prohibited, until and unless the legislature should pass laws to suppress it, was the controlling jurisprudence for this Court from 1954 until the constitutional convention in 1973. Polk, at 1138-1139. The delegates to the 1973 constitutional convention were aware of the Gandolfo decision, and made reference to it when "they removed the moral condemnation that gambling is a vice ....[,] adopted the word "suppressed," rather than "prohibited".... [, and] stated, explicitly, for the first time in a Louisiana constitution, that the legislature shall "define" gambling." Polk, at 1141. We concluded that these actions were "an obvious constitutional incorporation of the Gandolfo language regarding `how, when, where, and in what respects gambling shall be prohibited or permitted.'" Id.
This is not the first instance in which this court has considered the constitutionality of a statute which treats adult citizens between the ages of eighteen and twenty differently because of their age. In Manuel v. State, 95-2189 (La.3/8/96), 692 So.2d 320 (on reh'g), this court upheld the constitutionality of La. R.S. 14:93.10 through 14:93.14, 26:90(A)(1)(a) and (b), and 26:286(A)(1)(a) and (b), which raised the minimum drinking age in this state from eighteen to twenty-one years of age. We stated that the proponent of constitutionality of a statute which discriminates based upon age bears the burden of proving that the statute "substantially furthers an appropriate governmental purpose." After determining that highway safety is an appropriate *564 governmental purpose, we defined "substantially furthered" as follows:
The phrase "substantially furthers" in the standard for reviewing discriminatory statutes based on age imposes the requirement that the government purpose must be a substantial, as opposed to merely an incidental, reason for the classification. The intermediate standard of scrutiny thus accords less deference to the legislative branch than the rational relationship standard.
Id. at 340 n. 5.
La. R.S. 27:2(A) provides:
The legislature hereby finds and declares it to be the public policy of the state that the development of a controlled gaming industry to promote economic development of the state requires thorough and careful exercise of legislative power to protect the general welfare of the state's people by keeping the state free from criminal and corrupt elements. The legislature further finds and declares it to be the public policy of the state that to this all persons, locations, practices, associations, and activities related to the operation of licensed and qualified gaming establishments and the manufacture, supply, or distribution of gaming devices and equipment shall be strictly regulated.
In this case, the State asserts that La. R.S. 47:9025(B)(2), 47:9070, and 27:319 substantially further the governmental objectives of (1) protecting young adults in this state from their particular vulnerability to pathological gambling problems; and (2) protecting the public health and welfare in general; and (3) promoting and preserving a strictly regulated and socially responsible gaming industry.
Conversely, plaintiffs argue that the statutes at issue are presumptively unconstitutional under the Individual Dignity Clause because they deny eighteen to twenty year-old adults the ability to purchase lottery tickets solely because of their age. Plaintiffs urge that the legislature's attempt to prevent problem gambling among eighteen to twenty year-old citizens is not an appropriate governmental objective because it does not reach beyond that particular age group. Thus, the legislative act does not benefit the general welfare.
We find that protecting young adults in this state from their vulnerabilities, protecting public health and general welfare, and preserving the gaming industry are appropriate governmental purposes. Hence, the focus of our inquiry is whether removing eighteen to twenty year old persons from the group of adults who are allowed to participate in the Louisiana Lottery and operate video poker devices will substantially further these objectives.
At the preliminary injunction hearing, the State introduced the testimony of Dr. James Westphal, a psychiatrist, who was qualified as an expert in "addiction psychiatry compulsive gambling disorders, and the social and economic costs associated there and other problems associated with gambling disorders." Dr. Westphal is board certified in the field of psychiatry, with a sub-specialty certification in addiction psychiatry. He has over twenty years of experience in treating compulsive gamblers.
Dr. Westphal also served as Co-Chairman of the Louisiana Compulsive Gambling Study Committee, which was created by the Louisiana Legislature to study: (1) the problem of compulsive gambling; (2) the best practice approaches to preventing and addressing the problem of compulsive gambling; (3) the most effective, responsible, and equitable way to support the infrastructure necessary to prevent the problem; and (4) the steps that should be taken by the legislature to accomplish the establishment of the recommended infrastructure. The Committee was comprised of representatives from the Louisiana State Senate, the Southern University School of Social Work, the Louisiana Psychological Association, the Louisiana State Medical Society, Louisiana Economic Development Gaming Corporation, the Louisiana *565 Association of Licensed Professional Counselors, the Grambling State University School of Social Work, the Tulane University School of Medicine, the Louisiana State University School of Social Work, the Louisiana Chapter of the National Association of Social Workers, the Riverboat Casino Association of Louisiana, the Louisiana Department of Health and Hospitals, and the Louisiana Office of Mental Health. The Committee unanimously recommended increasing the age for purchasing lottery tickets and playing video poker from eighteen to twenty-one.
Dr. Westphal testified unequivocally that the eighteen to twenty year old age group is over-represented in terms of persons with gambling problems. His testimony was based upon studies conducted by Dr. Rachel Volberg, another expert in the field.[9] According to Dr. Volberg's study and Dr. Westphal's testimony, the prevalence of gambling disorders in persons in the eighteen to twenty year old age group is about three times that of adults twenty-one years of age and older. Dr. Westphal also stated that, although the eighteen to twenty year old age group only comprises 8.2% of the total adult population, that age group makes up 22.5% of total adults with gambling disorders. Thus, the eighteen to twenty year old group is significantly over-represented in terms of problem gamblers.
Dr. Westphal attributed the prevalence of gambling problems among eighteen to twenty year old persons to the fact that the central nervous system does not reach full maturity until humans reach their early twenties. He further testified that, because of the immature nervous system, persons under the age of twenty-one exhibit poor impulse control. He concluded that precluding eighteen to twenty year old persons from gambling would significantly decrease the number of gambling disorders in the State of Louisiana.
Dr. Westphal also testified that eighteen to twenty year old persons are much more susceptible to gambling related disorders than older adults, and he explained that delaying access to the addiction causing behavior will have a substantial positive impact on the problem. He also testified that, prior to raising the minimum gambling age to twenty-one, the two most common forms of legalized gambling among eighteen to twenty year old persons are lottery and video poker. He opined that by reducing accessibility of the lottery and video poker, the state will improve the welfare of the state and the people involved.
Dr. Westphal also gave unrefuted testimony regarding the enormous social costs attributable to problem gambling. He explained how these costs inflict injury on society as a whole. Specifically, he articulated these costs as criminal justice administration, civil suits, thefts, and related crimes, bad debts, and loss of productivity in the workforce. Dr. Westphal, in response to a legislative demand for an economic impact study, complied data regarding economic costs of problem gambling. The study revealed that in 1998 alone, the social costs of gambling disorders amounted to $480,000,000.00. According to Dr. Westphal, these costs are borne by society as a whole, as opposed to the individuals with gambling problems. Dr. Westphal also stated that in 1998, $100,000,000.00 in social costs in this state are attributable to *566 eighteen to twenty year old persons with gambling disorders.
Plaintiffs argue that even if the governmental objective is deemed appropriate, the objective is not substantially furthered in this case because the statutory scheme at issue leaves eighteen to twenty year-old persons with many other opportunities to gamble, such as parimutuel wagering, charitable gaming, and private wagering.
We find that the testimony of Dr. Westphal and the data compiled by Dr. Volberg supports that there is a relationship between increasing in the minimum age to purchase lottery tickets and operate video poker devices and the statutory objectives to protect the general welfare and preserve the gaming industry. Dr. Westphal gave uncontroverted testimony that, in his experience in dealing with addictive behavior, the longer accessibility is delayed, the likelihood of avoiding addiction is increased. Dr. Westphal further testified that playing the lottery and video poker are the most favored forms of legalized gambling among persons in the eighteen to twenty year age group. Additionally, he noted that gambling problems among eighteen to twenty year-old citizens of this state cost taxpayers over $100,000,000.00 in 1998 alone.

CONCLUSION
We conclude that raising the minimum age for purchasing lottery tickets and operating video poker is substantially related to the protection of the general welfare of this state. Accordingly, we overrule the district court's ruling that La. R.S. 47:9025(B)(2), 47:9070, and 27:319 are unconstitutional.
REVERSED.
KIMBALL, J., concurs and assigns reasons.
CALOGERO, C.J., additionally, concurs and assigns reasons.
LEMMON, J., dissents and assigns reasons.
CALOGERO, Chief Justice, subscribing to the opinion and assigning additional reasons.
I agree with the majority opinion. However, I write separately to build on that reasoning on an issue that I feel is important to the resolution of this case. Laws enacted by the Legislature are entitled to a presumption of constitutionality from our courts. See State v. Griffin, 495 So.2d 1306, 1308 (La.1986); City of Lake Charles v. Henning, 414 So.2d 331, 333 (La.1982). Further, "it is not enough [for a person challenging a statute] to show that the constitutionality [of the statute] is fairly debatable, but, rather, it must be shown clearly and convincingly that it was the constitutional aim to deny the Legislature the power to enact the statute." Board of Directors of Louisiana Recovery Dist. v. Taxpayers, Property Owners, & Citizens of the State of Louisiana, 529 So.2d 384, 388 (La.1988); accord Ancor v. Belden Concrete Products, Inc., 260 La. 372, 379, 256 So.2d 122, 125 (1971). This presumption of a statute's constitutionality is especially true in a situation such as this where the Legislature has limited the scope of gambling because the Louisiana Constitution commands: "Gambling shall be defined by and suppressed by the legislature." La. Const. art. XII, § 6(B).
As we held in Polk v. Edwards, this constitutional provision was intended to grant the Legislature extensive authority in its regulation of different types of gambling. 626 So.2d 1128, 1141 (La.1993). In fact, this broad authority was such that we found that "the Legislature has the power to `determine how, when, where and in what respects gambling shall be prohibited or permitted.'" Polk, 626 So.2d at 1141 (quoting Gandolfo v. Louisiana St. Racing Comm'n, 227 La. 45, 71-72, 78 So.2d 504, 514 (1954)). While this broad discretion does not permit the Legislature to ignore other mandates of the constitution (such as Article I, § 3 which prohibits discrimination based on race, religion, age, sex, culture, *567 physical condition, or political ideas), this deference to legislative action in the field of gambling should play an important role in our reasoning today.
KIMBALL, Justice, concurring.
I write separately to again voice my opinion that this court has not employed the appropriate test to determine whether statutes which discriminate on the basis of age are constitutional in light of Louisiana's unique constitutional provision which gives greater protection against age discrimination than either the United States Constitution or any other State Constitution. Here, however, under even the test which is, in my opinion, the appropriate test to be applied in this case, I believe the State has met its burden by persuasively showing that persons aged 18, 19 and 20 have three times the amount of gambling problems as persons aged 21 and over. The record evidence in this case shows that 18, 19 and 20 year olds are the age group "most responsible for the evil the government seeks to address." Manuel v. State, 95-2189 (La.3/8/96), 692 So.2d 320 (on rehearing) (Kimball, J. dissenting). Thus, the statute is not arbitrary and capricious. This is the type of showing that was absent from the record evidence presented in Manuel. In light of the record evidence presented in this case, I believe the statutes at issue are not arbitrary, capricious, or unreasonable. Therefore, I agree with the majority's conclusion that the district court's ruling that La. R.S. 47:9025(B)(2) and 47:9070 are unconstitutional must be reversed.
LEMMON, Justice, Dissenting.
In age discrimination cases, the standard for determining the constitutionality of a statutory classification based on age is whether the classification substantially furthers a significant governmental interest. La. Const. art. I § 3; Manuel v. State, 95-2189 (La.3/8/96), 692 So.2d 320 (on reh'g).
In Manuel, this court upheld the statutory provisions raising the minimum drinking age to twenty-one years. In so doing, this court focused on whether the statutes' drawing the line at an age higher than the age of majority substantially furthered the State's significant interest in improving highway safety. In concluding that a sufficient relationship existed, we relied primarily on national statistical data, which we found supported by experience, logic and common sense. Experience showed that a significant reduction in traffic fatalities among motorists in general occurred in other jurisdictions when the minimum drinking age was raised. Logic and common sense showed that increasing the drinking age establishes a "[p]rohibition of drinking by persons who are proportionately the most dangerous group of drinking drivers" and therefore "has to increase highway safety substantially, as opposed to incidentally." 95-2189 (on reh'g) at p. 10, 692 So.2d at 342. Further, we quoted a seasoned state trooper's apt remark that this age group "`is not only inexperienced at driving but is also inexperienced at drinking.'" 95-2189 (on reh'g) at p. 8, 692 So.2d at 341.
In the present case, the majority concludes that the State met its elevated burden of establishing that the statutes which increased the minimum age for operating video poker devices and purchasing lottery tickets substantially, as opposed to incidentally, furthers the appropriate governmental objectives of protecting young adults from their vulnerabilities, of protecting the public health and general welfare, and of preserving the gambling industry. I disagree.
The trial court concluded that the evidence failed to establish that the statutes substantially furthered the stated governmental objectives. The court reasoned that the beneficial effects of the statutory classification did not reach beyond the eighteen-to-twenty-year old group. This court in Manuel addressed the problem with relying on a justification that only benefits the age group that experiences the discrimination, explaining:

*568 The majority on original hearing took a mistaken view of the State's argument, noting that the State attempted to justify the classification on the basis that the statutes would reduce the incidence of intoxicated driving and alcohol-related accident in the eighteen-to-twenty age group. Of course, if that had been the State's argument, there was insufficient justification for a conclusion that the classification substantially furthered the improvement of highway safety in general. As the majority on original hearing noted, prohibiting use of alcohol by any age group would reduce the incidence of intoxicated driving and alcohol-related accidents in that age group and would not justify the discriminatory classification.
95-2189 at p. 9, 692 So.2d at 341-42 (emphasis in original). This court concluded that the appropriate governmental objective of improving highway safety in general was satisfied, reasoning that "[a]lthough any prohibition in the use of alcohol would have some beneficial effect on alcohol-related accidents, the specific evidence [in the record] establishes that the increase in the drinking age to twenty-one would have a significantly greater effect in reducing alcohol-related accidents [in general]." 95-2189 at pp. 10-11, 692 So.2d at 342.
An analysis that focuses only on the impact on the discriminated-against age group could be extended to any type of activity and thus is insufficient to satisfy the State's elevated burden. The State's proof, in the present case, as the trial court correctly concluded, shows only that the statutory classification will benefit the eighteen-to-twenty-year old adults; adults twenty-one years and older will still experience gambling problems and will not be substantially benefitted. Although some decrease in social costs will be obtained, the same could be said regardless of which age group of adult citizens was eliminated from gambling.
The trial court further found "as a fact that the defendants have not shown credible evidence which tends to establish problems related to gambling among 18 to 20 year olds to be greater than that found among those citizens 21 year old, or over."
The majority attempts to cure the proof problem by reasoning that an additional justification for the discriminatory classification is the need to protect this age group from their combined inexperience not only at gambling, but also at decision making. This observation apparently is an attempt to track the reasoning in Manuel that "[t]he eighteen-to-twenty-year-old group, who are barely experienced at driving legally, are totally inexperienced at drinking legally." 95-2189 at p. 8, 692 So.2d at 341. The synergistic effect of that group's inexperience not only with drinking, but also with driving, we held, resulted in a substantial improvement in highway safety in general by removal of that age group from drinking and driving. We concluded that this analysis provided the substantial furtherance of a significant governmental objective required for upholding such a discriminatory classification.[1]
There is a huge leap from the result in Manuel to the result in the present case. Raising the minimum drinking age not only benefitted the pertinent age group in particular and society in general to the *569 extent of benefits from withholding alcohol from the young and inexperienced, but also benefitted every motorist in this country by reducing alcohol consumption in the age group most responsible proportionately for alcohol-related highway accidents. No such significant benefit to safety, or to health and welfare, has even been suggested in the present case. On this record, the classification simply does not substantially further any significant government objective such as promoting highway safety, a significant state and national concern.
Furthermore, statistical experience is lacking in the gambling disorder field. Indeed, the expert evidence in this case pales in comparison to the detailed statistical evidence summarized in the appendix to Manuel. While the record in this case includes a National Gambling Impact Study Commission Report dated June 1999 which recommends that all legal gambling should be confined to those aged twenty-one or above, that same report acknowledges that "[t]he overall amount of high-quality and relevant research in this area is still extremely limited" and that "many policymakers have been forced to make decisions about expanding gambling with virtually no credible studies to rely on and, at best, only an assessment of the perceived social impacts." The executive summary of the Report likewise states that while it is known that adolescent gambling is a problem, "the full scope of this problem remains to be defined." Even the State's expert stated in a 1996 publication that:
[t]here are significant deficiencies in the epidemiological data on pathological gambling in Louisiana which are critical to planning intervention programs and making rational social policy decisions. Minimal data are available on the incidence and prevalence of gambling disorders in adolescents. The stability over time of the prevalence rates is also unknown especially in light of the rapid expansion of gambling in Louisiana.
James R. Westphal, MD, and Jill Rush, MD, DRPH, Pathological Gambling in Louisiana: An Epidemiological Perspective, 148 J. La. State Med. Soc. 353, 357-58 (1996).
Nor does common sense support the contested classification. Indeed, there is an inherent problem with the majority's reliance on the decision-making inexperience (immaturity) of eighteen-to-twenty-year old adults as a justification for this classification. This factor clearly was considered when the age of majority was lowered to eighteen, thereby setting the time at which these young adults have contractual capacity. See La. Civ.Code art. 29 (setting the age of majority at eighteen). To assert such inexperience at decision-making as support for age discrimination against the eighteen-to-twenty-year old group defies logic.
The majority's conclusion that the age discrimination at issue is constitutional is an unwarranted extension of Manuel.
NOTES
[1] Plaintiffs, Eugene Latour, II, Clyde Lafleur, and Joseph Lachney, Jr. represent the class. At the time the petition was filed, Latour was twenty years of age, Lafleur owned an establishment which held a license to operate video poker devices and sell lottery tickets to the general public in Evangeline Parish, and Lachney operated a retail business which held a license to operate video poker devices in Evangeline Parish.
[2] All parties agreed to have the permanent injunction heard on the same day as the preliminary injunction.
[3] La. Const. Art. V, § 5(D) provides that a case shall be appealable to the supreme court if a law or ordinance has been declared unconstitutional.
[4] La. R.S. 27:319 provides:

A. (1) No person licensed pursuant to the provisions of this Chapter, or any agent or employee thereof, shall allow a person under the age of twenty-one to play or operate a video draw poker device at a licensed establishment.
(2) The person licensed pursuant to provisions of this Chapter shall withhold all winnings from patrons who are determined to be under the age of twenty-one.
(3) The person licensed pursuant to provisions of this Chapter shall each quarter report and remit to the division all winnings withheld from patrons who are determined to be under the age of twenty-one.
B. (1) Violations of Subsection A of this Section shall be penalized by the division as follows:
(a) For allowing a person under the age of twenty-one to play or operate a video draw poker device at a licensed establishment, unless the licensee, his employee, or agent reasonably believed that the person was twenty-one years old or older:
(i) For a first or second violation, a fine of one thousand dollars shall be imposed.
(ii) For a third or subsequent violation, license revocation shall be imposed.
(b) For allowing a person under the age of twenty-one to play or operate a video draw poker device at a licensed establishment when the licensee, his employee, or agent is shown to have known or reasonably believed he was allowing a person under the age of twenty-one years old to play or operate a video draw poker device, or for allowing a person under the age fifteen years old to play or operate a video draw poker device at a licensed establishment regardless of what the licensee, his employee or agent knew or reasonably believed about the age of that person:
(i) For a first or second violation, license revocation may be imposed.
(ii) For a first or second violation, a fine of one thousand dollars shall be imposed if the license is not revoked.
(iii) For a third or subsequent violation, license revocation shall be imposed.
(2)(a) A licensee shall be provided notice of the charged violation and may concede the violation and accept the penalty or may deny the violation and demand a hearing be held, pursuant to R.S. 27:25, to make a determination regarding the charge.
(b) A violation shall have occurred only if the charged violation is conceded by the licensee to have occurred or is found to have occurred at a hearing held for that purpose.
(c) For the purposes of determining whether a second or subsequent violation has occurred, every violation shall have occurred on a separate occasion, at the same licensed location, and only violations that have occurred within a one-year period, regardless of when they were charged, conceded, or found to have occurred, shall be considered.
(d) For persons having more than one license issued pursuant to the provisions of this Chapter, license revocation as provided in this Subsection, shall only apply to the license of the licensed establishment where the violations occurred.
C. (1) It is unlawful for any person under twenty-one years of age to play or operate a video poker device.
(2) Whoever violates the provisions of this Subsection shall be fined not more than one hundred dollars.
(3) Any person apprehended while violating the provisions of this Subsection may be issued a citation by the apprehending law enforcement officer, which shall be paid in the same manner as provided for the offenders of local traffic violations.
[5] La. R.S. 27:324 authorizes local parishes and municipalities to enact zoning ordinances to regulate and restrict the placement or use of video poker devices. In the November 1996 Local Option Election, Louisiana voters were asked to vote on whether to permit the operation of video poker devices. After voters in thirty-three parishes rejected video poker, operators of video poker machines brought an action under 42 U.S.C.A. § 1983 to prevent the State of Louisiana from implementing the results of the election by terminating the operation of the video poker machines. Montecino v. State, 55 F.Supp.2d 547 (E.D.La.1999). The court held that the state-enforced cessation of video poker in those parishes did not violate the takings clause or procedural due process.
[6] Because we conclude that one of the plaintiffs has standing to raise the constitutionality of La.R.S. 27:319, we find no need to discuss Joseph Lachney's standing to raise the issue.
[7] La. R.S. 47:9025 provides, in pertinent part:

* * *
B. The board shall adopt rules to establish a system of verifying the validity of tickets claimed to win prizes and to effect payment of such prizes, except that:
* * *
(2) No ticket shall knowingly be sold to any person under the age of twenty-one, but this Section does not prohibit the purchase of a ticket by a person twenty-one years of age or older for the purpose of making a gift to any person of any age. If the donee of a winning ticket is under the age of twenty-one years, the corporation shall direct payment to a member of the person's family who is twenty-one years of age or older, or to the legal representative of the person on behalf of such person. The person named as custodian shall have the same powers and duties as prescribed for a custodian pursuant to the Uniform Transfers to Minors Act.
La. R.S. 47:9070 provides:
A. (1) No lottery retailer and no agent, associate, employee, representative, or servant of any such person shall sell a lottery ticket to any person under the age of twenty-one years, unless the person submits any one of the following forms of identification which establish the age of the person as twenty-one years or older:
(a) A valid, current, Louisiana driver's license which contains a photograph of the person presenting the driver's license.
(b) A valid, current, driver's license of another state which contains a photograph of the person and birth date of the person submitting the driver's license.
(c) A valid, current, special identification card issued by the state of Louisiana pursuant to R.S. 40:1321 containing a photograph of the person submitting the identification card.
(d) A valid, current, passport or visa issued by the federal government or another country or nation that contains a permanently attached photograph of the person and the date of birth of the person submitting the passport or visa.
(e) A valid, current, military or federal identification card issued by the federal government containing a photograph of the person and date of birth of the person submitting the identification card.
(2) Each form of identification listed in Paragraph (1) must on its face establish the age of the person as twenty-one years of age or older, and there must be no reason to doubt the authenticity or correctness of the identification. No form of identification mentioned in Paragraph (1) shall be accepted as proof of age if it is expired, defaced, mutilated, or altered. If the driver's license, state identification card, or lawful identification submitted is a duplicate, the person shall submit additional identification which contains the name, date of birth, and photograph of the person.
(3) An educational institution identification card, check-cashing identification card, or employee identification card shall not be considered as lawful identification for the purposes of this Subsection.
B. Any person who knowingly sells a lottery ticket to a person under twenty-one years of age shall be fined not less than one hundred dollars nor more than five hundred dollars for the first offense and, for each subsequent offense, not less than two hundred dollars or more than one thousand dollars.
C. (1) It is unlawful for any person under twenty-one years of age to purchase a lottery ticket.
(2) Whoever violates the provisions of this Subsection shall be fined not more than one hundred dollars.
(3) Any person apprehended while violating the provisions of this Subsection shall be issued a citation by the apprehending law enforcement officer, which shall be paid in the same manner as provided for the offenders of local traffic violations.
[8] The legislature amended La. R.S. 14:90 to say that the intentional conducting or assisting in the conducting of gaming activities at official gaming establishments (land-based casino and video-poker establishments), on cruiseships, and on riverboats is not gambling.

The Louisiana Economic Development & Gaming Corp. Act ("The Casino Act"), 1992 Acts 384, La. R.S. 4:601-686 and La. R.S. 14:90(E); The Cruiseship Gaming Act, 1991 Acts 289, La. R.S. 14:90(B); The Louisiana Riverboat Economic Development and Gaming Control Act ("The Riverboat Gaming Act"), 1991 Acts 753, La. R.S. 4:501-562 and La. R.S. 14:90(D), and The Video Draw Poker Devices Control Law ("The Video Poker Act"), 1991 Acts 1062, La. R.S. 33:4862.1-4862.19.
[9] Dr. Rachel A. Volberg, has directed or consulted on numerous studies of gambling and problem gambling since 1986. In North America, she has directed or consulted on baseline and replication surveys of gambling and problem gambling among adults in approximately 25 states and provinces. In addition to studies in the United States and Canada, Dr. Volberg has directed or consulted on baseline and replication surveys of gambling and problem gambling in the general population internationally, in countries as diverse as Australia, New Zealand, Great Britain and Sweden. Dr. Volberg has also directed surveys of gambling and problem gambling among adolescents, as well as surveys of gambling and problem gambling among Native Americans and heavy gamblers in the United States and Canada.
[1] After Manuel, this court in State v. Ferris, 99-2329 (La.5/16/00), 762 So.2d 601, upheld the statute setting a lower blood alcohol concentration level for intoxicated persons under twenty-one. In Ferris, the State relied on the same evidence it introduced in Manuel. As in Manuel, we took judicial notice that almost all the states have enacted similar zero tolerance laws. We concluded that the age classification provided an ever closer "classificatory fit" than in Manuel. While the statutes in Manuel addressed only underaged drinking, we noted the repeated reference in Manuel to the real problem targeted being "youthful drinking and driving." In Ferris, the statute addressed the dual activities of drinking and driving. Hence, we concluded that the State established the age classification substantially, not just incidentally, furthered the appropriate governmental purpose of improving overall highway safety.