27 So.3d 247 (2009)
STATE in the Interest of A.J.
No. 2009-KA-0477.
Supreme Court of Louisiana.
December 1, 2009.
James D. Caldwell, Attorney General, Leon A. Cannizzaro, Jr., District Attorney, Jerry L. Settle, Alyson R. Graugnard, Assistant District Attorneys, for applicant.
*248 Orleans Public Defenders, Joshua A. Perry; Juvenile Regional Services, Ilona Prieto Picou, Cheri J. Deatsch; Tulane Juvenile Law Clinic, David R. Katner, Director, Kesana A. Branford, Wesley A. Garten, Richard J. Lockett, Jr., Student Attorneys, for appellee.
Jennifer Ancona Semko, for amicus curiae, National Juvenile Defender Center and Juvenile Law Center.
VICTORY, J.[*]
Pursuant to Article V, Section 5(D)(1) of the Louisiana Constitution, this is a direct appeal of an Orleans Parish Juvenile Court judgment declaring that Article 882 of the Louisiana Children's Code, which denies juveniles the right to a jury trial in juvenile adjudications, violates the United States and Louisiana Constitutions where the juvenile is subject to a potential deprivation of liberty of more than six months. After reviewing the record and the applicable law, we reverse the juvenile court's ruling.

FACTS AND PROCEDURAL HISTORY
On April 15, 2008, the state filed a petition to commence a delinquency proceeding in Orleans Parish Juvenile Court, alleging that A.J., age fourteen, committed six felony-grade delinquent acts, i.e., six aggravated rapes, upon his five and seven-year-old siblings, in the interval between January 1, 2007, and December 31, 2007.[1]
On May 7, 2008, A.J. moved for a jury trial.[2] The juvenile court judge asked for supplemental briefing on the following:

*249 (1) Under a federal due process fundamental fairness analysis, does a juvenile have a 14th Amendment right to a jury trial?
(2) Under a federal minimum scrutiny equal protection analysis of the 14th Amendment, does a juvenile have a right to a jury trial?
(3) Under the Louisiana constitution's due process clause in Art. I, sec. 2, using the four part test from In re C.B.[, 97-2783 (La.3/4/98), 708 So.2d 391] outlined above (but not limited to same), does a juvenile have a right to a jury trial?
(4) Under the Louisiana constitution's equal protection clause in Art. I, sec. 3, using the test as outlined in Sibley[ v. Bd. of Supervisors, 477 So.2d 1094 (La. 1985) (on reh'g)] in regard to age classifications, the state must show:
1. What is the state purpose of the age classification found in Ch.C. Art. 882; and
2. How is that purpose substantially related to the statute's age-based classification.
A.J. responded as follows. First, he contended that, although the plurality in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (in which the Supreme Court considered whether the Due Process Clause of the Fourteenth Amendment assures the right to trial by jury in state juvenile delinquency proceedings), stopped short of extending the right to a jury trial to juveniles, McKeiver left open the possibility that the Court would extend the right in the future if the line between delinquency proceedings and adult criminal prosecutions became sufficiently blurred. The instant proceedings, A.J. argued, would be sufficiently like an adult prosecution because they would be public and the penalty would be severe.[3] Second, A.J. briefly asserted that there was no rational basis for denying juveniles the right to a jury trial and thus La.Ch.C. arts. 808 and 882 violated the Equal Protection clause of the Fourteenth Amendment. Third, A.J. contended that juvenile delinquency proceedings that might result in confinement for more than six months are fundamentally unfair in the absence of a jury and therefore those juveniles are denied the due process to which they are entitled by La. Const. Art. 1, § 2. Fourth, A.J. briefly asserted that differentiating between a juvenile and an adult (who are both accused of aggravated rape) with regards to the right to a jury is an age-related classification that does not substantially further an appropriate governmental purpose and is therefore prohibited by La. Const. Art. 1, § 3.
The state argued that A.J. had offered no basis to overturn settled law. First, the state noted that the Supreme Court in McKeiver and this Court in State ex rel. D.J., 01-2149 (La.5/14/02), 817 So.2d 26, rejected the claim that juvenile delinquency adjudications were fundamentally unfair because the proceedings are conducted without a jury. Second, the state asserted that equal protection challenges to similar statutory provisions have failed in other *250 jurisdictions, and the state contended that La.Ch.C. art. 882 passes the minimal rational-basis scrutiny that is applicable under federal equal protection jurisprudence. Third, the state applied the analysis from In re C.B. to conclude that the enactment also does not deny the movant due process under the state constitution. Fourth, the state contended that the age classification at issue ensures that juveniles "receive proper care and rehabilitation" and assures that they not be "exposed to the adult penal system," and thus substantially furthers the appropriate governmental purposes of "rehabilitation and well-being."
The juvenile court judge granted A.J.'s motion for a jury trial on January 20, 2009, and issued extensive reasons for judgment in 83 pages. At the outset, the juvenile court judge revealed frustration with the status quo in this area of law:
After ten years on the juvenile bench, this court cannot continue to indulge the legal fictions of juvenile court: that jail does not mean jail, that juvenile crime is not really crime; that a proceeding that uses armed guards and shackles is actually civil; or that liberty means one thing for adults and something else for juveniles. Who are we trying to convince? The juvenile? The victim? These fictions have only one purpose: to rationalize not applying the United States and Louisiana Constitutions as written. To this court, constitutional rights should not fall to legal fictions.
Based on centuries of Anglo-American common law tradition, basic concepts of fairness, and the words of the federal and state constitutions, this court is of the opinion that a juvenile cannot be constitutionally deprived of liberty for more than six months, without the right to a jury trial.
Regarding A.J.'s federal due process claim, the juvenile court judge criticized McKeiver for framing the issue as a false dichotomous choice between rehabilitative juvenile proceedings and the right to a jury trial, and the juvenile court distinguished McKeiver on the nature of the delinquent acts alleged[4] as well as the structure of juvenile adjudications in Louisiana today,[5] before ultimately construing *251 the holding of McKeiver narrowly as neither compelling nor prohibiting jury trials in juvenile proceedings.
With this backdrop, the juvenile court scrutinized the terms used in the Children's Code and Code of Criminal Procedure before concluding that a delinquency adjudication is equivalent to a criminal prosecution for purposes of the Sixth Amendment, and that the Sixth Amendment (in conjunction with the Due Process clause of the Fourteenth Amendment) requires a jury trial if a juvenile is to be deprived of liberty for more than six months. Regarding the movant's federal equal protection claim, the juvenile court rejected the state's justifications for distinguishing between juveniles and adults with regard to the right to a jury trial (i.e., "to provide a court system for juveniles that provides treatment and rehabilitation and to protect the juvenile from incarceration at hard labor for a lengthy sentence or possibly for life in the adult criminal justice system"), and instead concluded that there was no rational basis for denying a jury trial to a juvenile who faces a substantial deprivation of liberty. Regarding the movant's state due process claim, the juvenile court applied a three-part test[6] to find that: (1) jury trials were permitted to children as young as eight during some historical periods of the common law; (2) the flexibility, informality, and speed of juvenile adjudications would not be negatively impacted by jury trials;[7] and (3) the right to a jury trial is fundamental and the link between the withholding of that right and any putative benefits is tenuous. With regard to the movant's state equal protection claim, the juvenile court found that La.Ch.C. art. 882 classifies persons on the basis of age without substantially furthering an appropriate governmental purpose.[8] Therefore, the juvenile *252 court granted the motion for a jury trial:
When the potential penalty for criminal conduct is deprivation of liberty in excess of six months, the choice of a judge or a jury is a decision that our Anglo-American common law tradition has placed in the hands of the defendant and the defendant alone. The U.S. Constitution's Sixth Amendment and Art. I, Sec. 17 of the Louisiana Constitution, as written, guarantee the right to a jury trial: both provisions extend to all persons and on their face make no distinction on the basis of age. However, due solely to the historical anomaly of juvenile court theory, those rights are not applied as written to juveniles. The result of a delinquency adjudication can be a constitutional deprivation of liberty; as such, the right to a jury trial should be applied as written in both constitutions, to proceedings that place liberty in jeopardy for more than six months, without an age-based exception.
The state objected to the juvenile court's ruling at the hearing on January 28, 2009, and filed its motion for appeal on January 30, 2009. In brief to this Court, the state contends that the juvenile court erred both in granting the motion for a jury trial and in declaring that La.Ch.C. art. 882 violates the state and federal constitutions.

DISCUSSION
The Children's Code articles at issue provide:
Art. 808. Constitutional rights of accused delinquents.
All rights guaranteed to criminal defendants by the Constitution of the United States or the Constitution of Louisiana, except the right to jury trial, shall be applicable in juvenile court proceedings brought under this Title.
Art. 882. Adjudication by the court.
The adjudication hearing shall be held before the court without a jury.
These articles in conjunction effectively prohibit jury trials in all juvenile court proceedings. See State ex rel. D.J., supra at 28-29. In the instant case, the juvenile court judge found that this prohibition violates both state and federal guarantees of due process and equal protection. For the following reasons, we find that juvenile court judge erred in his ruling.

I. Due Process
In Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Supreme Court extended the Sixth Amendment right to a jury trial to the states through the Fourteenth Amendment's Due Process Clause. The Duncan Court applied a "fundamental rights" test[9] *253 to decide that the right to a jury trial is necessary for due process in certain criminal trials. Weighing the institutional concerns in granting all defendants the right to a jury trial, the Duncan court held that a jury trial is a fundamental right when the defendant is accused of a serious crime. Thus, the Duncan Court decided that whether a jury trial is a fundamental right should be decided based on the potential sentence. Duncan, 391 U.S. at 159-61, 88 S.Ct. at 1452-54. The court later qualified in Baldwin v. New York, 399 U.S. 66, 69, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437 (1970), that the potential for any prison term longer than six months entitles a defendant to a jury trial.
Previously, in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the Supreme Court had expressed concern about the state of the juvenile courts,[10] and made numerous references to due process and fair treatment in dicta.[11] Shortly afterward, the Court in Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), held that due process requires that a juvenile defendant be provided with notice of charges, right to counsel, the right to confront and cross-examine witnesses, and the privilege against self-incrimination. Following Gault, the states were divided over whether "fundamental fairness" also meant that the right to a jury trial was extended by the due process clause to state delinquency proceedings.[12] The Court decided this issue in McKeiver v. Pennsylvania and held that fundamental fairness did not require *254 states to provide a jury in juvenile delinquency proceedings. McKeiver, 403 U.S. at 545, 91 S.Ct. at 1986 ("we conclude that trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement"). Based on what the Court perceived as fundamental differences between juvenile and criminal proceedings, the McKeiver court refused to extend Duncan v. Louisiana to juvenile court proceedings.[13] The McKeiver plurality, however, left open the possibility that the Court might revisit its ruling in the future, stating "[p]erhaps that ultimate disillusionment will come one day, but for the moment we are disinclined to give impetus to it." McKeiver, 403 U.S. at 551, 91 S.Ct. at 1989.
In the instant case, the juvenile court judge, A.J., and the amicus devote considerable effort to challenging McKeiver.[14] *255 Although framed in terms of "distinguishing" this decision, the bulk of their analyses consists of critiques of the reasons provided by the plurality for its holding. Furthermore, all three suggest that the McKeiver Court simply erred in holding that trial by jury in a juvenile adjudication is not a constitutional requirement. These arguments thus exceed the claim that an apparently similar prior case is distinguishable from the instant one and instead are tantamount to a challenge to the continuing precedential viability of McKeiver. However, despite initially indicating that it may revisit its holding in the future, the Supreme Court has yet to do so and McKeiver remains controlling law.[15] Therefore, in ruling in spite of McKeiver that La.Ch.C. art. 882 violates federal standards of due process, the juvenile court judge simply issued a ruling contrary to controlling precedent from the United States Supreme Court,[16] which is clearly has no authority to do.[17]
*256 Furthermore, in light of McKeiver, Louisiana, as well as most other jurisdictions, have considered it settled that jury trials in juvenile delinquency proceedings are not mandated by concerns of fundamental fairness.[18] Before the enactment of La. Ch.C. art. 882, this Court in State in the Interest of Dino, 359 So.2d 586 (La.1978), found that the right to a jury trial was not among the rights afforded juveniles by due process:
The juvenile court determined that a person in relator's circumstances is denied the right to a jury trial by La. R.S. 13:1579(A), which, in pertinent part, provides:
"All cases of children shall be heard separately from the trial of cases against adults and shall be tried without a jury."
For a majority of this Court, the only question presented by this ruling is whether a jury trial is among the essentials of due process and fair treatment required during juvenile adjudicatory proceedings. A majority of the United States Supreme Court, in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), held that the due process clause of the Fourteenth Amendment does not impose the Sixth Amendment right to jury trial upon the states in juvenile delinquency proceedings. For reasons similar to those expressed in McKeiver, a majority of this Court has concluded that the Louisiana due process guaranty, La. Const. 1974, Art. 1, § 2, does not afford a juvenile the right to a jury trial during the adjudication of a charge of delinquency based upon acts that would constitute a crime if engaged in by an adult.
State in the Interest of Dino, 359 So.2d at 597-98 (footnote omitted). Later, in the context of a challenge to Children's Code art. 808, this Court in State ex rel. D.J., supra, declined to overrule State in the Interest of Dino and again relied on McKeiver to hold that:
. . . [A] trial by jury in a juvenile proceeding is not constitutionally required under the applicable due process standard in juvenile proceedings.
State ex rel. D.J., supra at 34. In State ex rel. D.J., this Court noted that McKeiver had been criticized as an anachronism whose rationale was inapplicable to the present reality (circa 2001) of juvenile justice:
In the present case, the juveniles and the amici strenuously argue that this policy-based analysis applied more than 20 years ago when McKeiver and Dino were decided is outdated and that recent changes in state law, as well as an ongoing national critique of the juvenile justice system, render the reasoning behind the two cases outdated and inapplicable to current conditions. The juveniles and their amici argue that since the McKeiver decision, the Louisiana juvenile system has taken on more trappings of the criminal justice system, so much so that the only substantial difference between *257 the two is the right to a jury trial. They argue that not only do juvenile defendants have virtually all of the constitutional rights afforded to adult defendants (except the jury trial right), but that the following two recent legislative amendments [i.e., that certain juvenile cases are open to the public and that certain juvenile adjudications may be used to enhance subsequent felony offenses] have torn down the remaining characteristics of what traditionally identified the juvenile system.
State ex rel. D.J., supra at 30-31. However, we rejected that criticism:
[I]n spite of these arguments, for the reasons stated below, we find that fundamental fairness does not require us to overrule Dino's holding that due process does not afford a juvenile the right to a jury trial during the adjudication of a charge of delinquency in juvenile court. Since Dino, this Court had occasion to review the juvenile justice system in accordance with the fundamental fairness standard in In re C.B., supra.[19] In that case, this Court considered the constitutionality of a recently enacted statute which authorized the transfer of adjudicated juvenile delinquents to adult correctional facilities when the delinquents reached the age of 17. The Court noted that changes in the juvenile system have resulted in the Children's Code now granting "to juveniles adjudicated in juvenile court proceedings essentially all rights guaranteed to criminal defendants by the federal and state constitutions, except the right to trial by jury." Id. at 396. However, we specifically discussed "recent amendments to the Children's Code" that have "blurred the distinction between the adult and juvenile court systems," which are the same amendments that the appellees in this case point to as justification for overruling Dino, i.e., that certain juvenile delinquency cases are now open to the public by virtue of La.Ch.C. art. 407, and that the Habitual Offender Law, La. R.S. 15:529.1, now provides that juvenile *258 adjudications for drug offenses or certain crimes of violence may be used to enhance subsequent felony offenses. Id. Consequently, in considering whether the statute at issue was constitutional in In re C.B., the Court stated that "the issue now becomes how much of the unique nature of the juvenile procedures can be eroded before due process requires that the juveniles be afforded all the guarantees afforded adult criminals under the constitution, including the right to trial by jury." Id. Ultimately, we decided that confinement to hard labor at adult facilities would erode the unique nature of the juvenile procedure so far that due process required all the guarantees under the constitution; however, rather than require a jury trial, the Court declared the statute allowing the transfer to adult facilities to be unconstitutional under the due process clause. This holding is significant, because it infers that the Court determined that the other statutes that "blurred the distinction" between adult and juvenile proceedings, such as the public hearing and the sentence enhancement statutes, did not offend due process requirements to such an extent that a jury trial would be required.
State ex rel. D.J., supra at 32 (footnote omitted). Further, we emphasized three factors we found persuasive in rejecting that movant's arguments: (1) the necessity, as recognized in McKeiver, of maintaining the juvenile judge's flexibility;[20] (2) the great disparity in severity between juvenile dispositions and adult sentences;[21] and (3) that the majority of jurisdictions have rejected the claim that McKeiver is no longer controlling law.[22] This Court *259 has subsequently cited State ex rel. D.J. favorably and used it as part of its rationale for ruling in State v. Brown, 03-2788 (La.7/6/04), 879 So.2d 1276, that juvenile adjudications cannot be used to enhance adult felony convictions pursuant to La. R.S. 15:529.1. In fact, in In re C.B., this Court noted that it had already resolved the following issues in prior decisions:
Consequently, this Court has determined, inter alia, that the juvenile has a right to plead not guilty by reason of insanity and a right to a hearing to determine his mental capacity in his defense, Causey, 363 So.2d 472, the right to bail pending adjudication, State v. Hundley, 263 La. 94, 267 So.2d 207 (1972); In re Aaron, 390 So.2d 208 (La. 1980), and the right to a public trial, Dino, 359 So.2d at 586.
This Court, however, based on the United States Supreme Court's reasoning in McKeiver, supra, determined that due process and fundamental fairness did not require that the juvenile be granted the right to trial by jury; a right that is guaranteed by Article 1, § 17 of our state constitution in certain criminal cases. (emphasis added).
In re C.B., 708 So.2d at 398 (footnotes omitted).
In spite of our prior holdings, much of the juvenile court judge's analysis focuses on concern that juvenile justice has become increasingly like criminal justice. However, this concern appeared in McKeiver itself and was addressed in In re C.B. and State ex rel. D.J. In language prefatory to the fundamental fairness analysis in In re C.B., we commented on the increasing focus on the punitive aspects of delinquency proceedings and suggested that it may reach a point at which due process may dictate a right to a trial by jury for juveniles:
The changing nature of juvenile crime, however, has engendered changes in the nature of the juvenile delinquency adjudication which have blurred the distinction between juvenile and adult procedures. The Children's Code now grants to juveniles adjudicated in juvenile court proceedings essentially all rights guaranteed to criminal defendants by the federal and state constitutions, except the right to trial by jury. La. Ch. C. Ann. art. 808 (West, 1995). Additionally, the Louisiana Legislature has, with recent amendments to the Children's Code, blurred the distinction between the juvenile and adult court systems. Juvenile delinquency cases involving crimes of violence as defined by LSA-RS 14:2(13) are open to the public, which essentially destroys the confidentiality of certain juvenile proceedings. See La. Ch. C. Ann. art. 407(A), amended by 1994 La. Acts 120. The Habitual Offender Law provides that juvenile adjudications for drug offenses or crimes of violence, as defined by LSA-RS 15:529.1, may be used to enhance subsequent felony offenses. LSA-RS 15:529.1 (West Supp., 1998). Prior to this change, juvenile adjudications were sealed and did not follow an individual into adulthood.
Consequently then, the once heralded distinctions between juvenile and adult *260 proceedings in this state are fast diminishing, and are further accelerated by the statute currently before us. The issue now becomes how much of the unique nature of the juvenile procedures can be eroded before due process requires that the juveniles be afforded all the guarantees afforded adult criminals under the constitution, including the right to trial by jury. We now turn to the applicable legal principles for guidance on this issue.
In re C.B., supra at 396. Indeed, we then found that the enactment of the statute allowing the transfer of adjudicated delinquents to adult correctional facilities "has sufficiently tilted the scales away from a `civil' proceeding, with its focus on rehabilitation, to one purely criminal."[23] Therefore, we declared La. R.S. 15:902.1 as applied by Regulation B-02-008 unconstitutional, and thereby restored the boundary between juvenile delinquency proceedings and adult criminal prosecutions to its status quo ante. Accordingly, in State ex rel. D.J., we later rejected the argument that "the Louisiana juvenile system has taken on more trappings of the criminal justice system, so much so that the only substantial difference between the two is the right to a jury trial." State ex rel. D.J., 01-2149 at 7, 817 So.2d at 30. Likewise, in State v. Brown, supra at 1288-89, this Court found juvenile adjudications sufficiently distinct from adult convictions and therefore unsuitable for recidivist sentence enhancement purposes:
Even though it was argued that because (1) the juvenile justice system had taken on more of the trappings of the criminal justice system; (2) the role of punishment had increased in the juvenile system; and (3) the legislative amendments opening the proceedings to the public and allowing juvenile adjudications to serve as predicate offenses for adult felony sentence enhancement, due process required juveniles receive a jury trial, we continued to uphold Dino's decree that Art. I, § 2 of our State Constitution does not afford a juvenile the right to a jury trial in a juvenile proceeding. State in the Interest of D.J., p. 13, 817 So.2d at 34. Among our reasons for our continued holding is that even with the changes in the juvenile justice system, "there remains a great disparity in the severity of penalties faced by a juvenile charged with delinquency and an adult defendant charged with the same crime." Id. p. 10, 817 So.2d at 33. To allow these adjudications to serve as "prior convictions" for purposes of sentence enhancement for adult felony offenses would lessen this disparity and contribute to "blurr[ing] the distinction between juvenile and adult procedures." In re C.B., p. 8, 708 So.2d at 396.
Thus, this Court has closely monitored the "blurred boundary" at issue and has found that boundary to be properly restored; therefore, the juvenile court judge erred in using this rationale to determine that La. Ch.C. art. 882 is unconstitutional at this time.
Furthermore, although A.J. argues that juvenile justice in Louisiana is becoming increasingly like criminal justice, he is not able to name any developments that post-date this Court's ruling in State ex rel. D.J. Instead, the arguments underlying the instant ruling largely mirror those previously rejected by this Court. Although some commentators call for states to give juvenile offenders the right to trial by jury,[24] attempts to establish a constitutional right to a jury trial for juveniles have been largely unsuccessful, and challenges, *261 like the instant one, claiming that fundamental changes in the nature of the juvenile justice system have undermined the validity of the McKeiver Court's analysis have been routinely rejected.[25] Likewise, attempts to recognize a state constitutional right to a jury trial in juvenile matters have been largely unsuccessful.[26] Arguments claiming that particular statutory schemes are so punitive and have little or no rehabilitative focus so as to render McKeiver inapplicable have been similarly unavailing.[27] Finally, arguments that other federal constitutional protections invoke a juvenile's right to a jury trial have failed.[28] Thus, despite the variety of arguments on the issue, courts have almost universally rejected the claim that juveniles possess a constitutional right to a trial by jury.[29] Finally, a majority of state jurisdictions continue to declare by statute that juvenile proceedings shall be conducted without a jury.[30]
While A.J. and amicus emphasize that a number of states now provide the *262 right to a jury trial in juvenile delinquency adjudications in some circumstances, significantly, the majority of these jurisdictions have provided the right by statute.[31] Furthermore, of those jurisdictions in which the right is established judicially, only one, a recent decision from Kansas, has found any basis for such a right under the Sixth Amendment.[32] This decision, however, arises from a very different legal environment than the instant case. The Kansas Supreme Court, after initially holding that juveniles are not entitled to jury trial in Findlay v. State, 235 Kan. 462, 681 P.2d 20 (1984), has since held in In re L.M., 286 Kan. 460, 186 P.3d 164 (2008), that juveniles are entitled to jury trial under the Sixth and Fourteenth Amendments as well as the Kansas constitution,[33] because it found that a wholesale legislative reworking of that jurisdiction's equivalent statutory enactment to the Louisiana's Children's Code (the Kansas Juvenile Justice Code) has demonstrated a shift from a rehabilitative purpose to a more punitive one and made juvenile proceedings more akin to criminal proceedings in that jurisdiction.[34] Sixteen year old L.M. was *263 charged as a juvenile offender with one count of sexual battery in violation of K.S.A. 21-3518 and one count of minor in possession of alcohol in violation of K.S.A. 2005 Supp. 41-727. In re L.M., 186 P.3d at 171. L.M.'s motion for a jury trial was denied, L.M. was found guilty after a bench trial, and L.M. was sentenced to 18 months in a juvenile correctional facility but the sentence was suspended. Id. L.M. was also ordered to register as a sex offender. One of L.M.'s contentions on appeal was that the Kansas statutes which gave the juvenile court discretion in determining whether he should be granted a jury trial were unconstitutional. Id. at 165-66. The Kansas Supreme Court noted that it previously found in 1984 in Findlay v. State that juvenile adjudications at that time were not criminal prosecutions to which the Sixth Amendment applies. However, in the intervening 24 years, the court found that dramatic legislative action had occurred that made juvenile adjudications more adversarial in nature and thus more equivalent to criminal prosecutions in Kansas.[35] Louisiana, in contrast, has gone through no comparable wholesale revision, and this Court examined contentions identical to those of the instant movant and rejected them just 7 years ago in State ex rel. D.J. Thus, with the exception of Kansas, the legal landscape in this area remains largely unchanged since this Court last addressed this issue in State ex rel. D.J. For these reasons, we find that the juvenile court judge erred in finding that La.Ch.C. art. 882 runs afoul of state and federal principles of due process.

II. Equal Protection
The Fourteenth Amendment to the United States Constitution provides in pertinent part that "no State shall . . . deny within its jurisdiction the equal protection of the laws." For equal protection purposes under federal law, age is not a suspect classification and distinctions based on age are subject to rational basis review. Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410.
We note at the outset that the Supreme Court has never upheld an equal protection claim in a juvenile delinquency case.[36] Similarly, although not decided on the basis of equal protection, this Court noted *264 in State ex rel. D.J. that federal equal protection challenges to statutes that disallow the use of juries in delinquency adjudications have been unsuccessful. In fact, McKeiver provides an enormous obstacle to any equal protection challenge. Although decided on due process grounds, McKeiver rests on the determination that juvenile courts are legitimately distinct from criminal courts.[37] Therefore, citations to McKeiver abound in determinations that there is a rational basis for treating juvenile differently from adult offenders.[38] Furthermore, although equal protection and due process utilize distinct analyses, jurisdictions often find it significant to equal protection claims that due process does not require jury trials in juvenile proceedings.[39] Instead, the consensus appears to be that equal protection simply does not provide the proper analytical framework for the discussing a right to jury trial in delinquency proceedings given that the Supreme Court in McKeiver so firmly rooted the discussion in due process:
The existence of the juvenile court system itself is a recognition of the validity of the separate classification of juveniles for correctional purposes. We think that the right of a juvenile to a jury trial in juvenile court, if one exists, does not have its origin in the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.
DeBacker v. Sigler, 185 Neb. 352, 175 N.W.2d 912, 913 (1970). Similarly, this Court has rejected the comparison of juveniles to adults that is a prerequisite to any equal protection analysis:

Gault recognized that post-adjudication dispositions of juveniles are unique to the juvenile process. Thus, we reject at the outset Bank's contention that juvenile delinquents are situated similarly to convicted adult defendants. Their positions are simply not analogous.
State in Interest of Banks, 402 So.2d 690, 695 (La.1981).[40] Other jurisdictions have agreed:
The state "may not draw distinctions between individuals that are irrelevant to a legitimate governmental objective." Lehr v. Robertson (1983), 463 U.S. 248, 265, 103 S.Ct. 2985, 2995, 77 L.Ed.2d 614. Thus, as the first step in the equal protection analysis, "the Court must determine whether persons similarly situated are in fact being treated differently." Grove v. Ohio State University College of Veterinary Medicine (S.D.Ohio 1976), 424 F.Supp. 377, 387. (Emphasis added).

*265 We find that juveniles adjudicated delinquent and adults convicted of a crime are not groups that are similarly situated. Courts have recognized in a variety of contexts that the state is justified in treating juveniles differently than adults because of its interest in preserving and promoting the welfare of the child. See e.g., Schall v. Martin (1984), 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207; McKeiver v. Pennsylvania (1971), 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647; Prince v. Massachusetts (1944), 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645; Mominee[v. Scherbarth], supra, at [28 Ohio St.3d 270]273-74[28 OBR 346, 503 N.E.2d 717]. This proposition is particularly applicable in the context of delinquency proceedings.
Juveniles are entitled to proceedings that "measure up to the essentials of due process and fair treatment," In re Gault (1967), 387 U.S. 1, 30, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527. However, "the Constitution does not mandate elimination of all differences in the treatment of juveniles." The state's interest in the welfare of children makes "a juvenile proceeding fundamentally different from an adult criminal trial." Schall, supra, at 263, 104 S.Ct. at 2409. For example, the United States Supreme Court has not extended the right to jury trials to juveniles in delinquency proceedings because to do so would destroy the informality and flexibility inherent in juvenile court proceedings. McKeiver, supra, at 545, 91 S.Ct. at 1986.
In re Vaughn, 1990 WL 116936 *5 (Ohio App.1990).
Regardless, even assuming that due process has not foreclosed further discussion, for the purpose of delinquency laws, juveniles are not members of a suspect class, are not similarly situated to adult criminal defendants, and even if they were, there is a rational basis for treating them differently.[41] As noted above, the McKeiver Court ultimately concluded that "trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement,"[42] and that if a state legislature chooses to afford juveniles jury trial rights, it "is the State's privilege and not its obligation."[43] Therefore, the question is whether the state has rationally opted not to extend this right juveniles while affording it to adults.[44] The Supreme Court has stated that a state's interest in "safeguarding the physical and psychological well-being of a minor is compelling."[45] *266 As a result, the Court has sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights.[46] Given the state's recognized compelling interest in this area, courts have routinely found that statutes like La.Ch.C. art. 882 pass minimal basis scrutiny.[47]
The analysis is not much changed under state law. La. Const. art. 1, § 3 provides as follows:
No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.
Unlike the federal constitution, a state constitution's provisions are not grants of power, but instead are limitations on the otherwise plenary power of the people of a state, exercised through its legislature.[48] Therefore, the legislature may enact any legislation the state constitution does not prohibit.[49] In Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094, 1107-1108 (La.1985), this Court provided a succinct analysis of Louisiana's equal protection clause:
Article I, Section 3 commands the courts to decline enforcement of a legislative classification of individuals in three different situations: (1) When the law classifies individuals by race or religious beliefs, it shall be repudiated completely; (2) When the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of the classification shows that the classification has a reasonable basis; (3) When the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate state interest.
More recently, this Court held in Manuel v. State, 95-2189 (La.3/8/96), 692 So.2d 320, that when a statute classifies persons on the basis of any of the six enumerated grounds found in the third sentence of La. Const. art. 1, § 3, including age, the statute is unconstitutional unless the proponents are able to prove that the legislative classification "substantially furthers an appropriate state purpose."[50]Manuel further *267 dictates that because age is specifically enumerated in Section 3, "the burden of proof is on the proponent of constitutionality to show that the statute establishing such a classification substantially furthers an appropriate governmental purpose."[51]
A comprehensive juvenile system was established by the Louisiana Legislature to protect and rehabilitate juvenile offenders and to "insure that he shall receive. . the care, guidance, and control that will be conducive to his welfare and the best interests of the state . . ." La. Ch.C. art. 801. As we have previously stated, "[t]he hallmark of the [juvenile] system was its disposition, individually tailored to address the needs and abilities of the juvenile in question," State ex rel. D.J., supra at 29 (cites omitted) and "the unique nature of the juvenile system is manifested in its non-criminal, or "civil," nature, its focus on rehabilitation and individual treatment rather than retribution, and the state's role as parens patriae in managing the welfare of the juvenile in state custody." In re C.B., supra at 396-97 (cites omitted). We find that is specialized treatment of juveniles is an appropriate governmental purpose for purposes of the equal protection clause.
Next, we must consider whether denying juveniles the right to a jury trial substantially furthers that purpose. As we noted in State ex rel. D.J., "[t]he Supreme Court reasoned in McKeiver that if a jury trial were required it would `remake the juvenile proceeding into a fully adversary process and [would] put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding.'" State ex rel. D.J., supra at 26 (citing McKeiver, 403 U.S. at 545, 91 S.Ct. at 1986). We further noted that in McKeiver, the Court "focused on the role of the jury as a `fact finder,' . . . and noted that the imposition of a jury trial would not `strengthen greatly, if at all, the factfinding function, and, would, contrarily, provide an attrition of the juvenile court's assumed ability to function in a unique manner.'" Id. Finally, we found that "affording juvenile offenders the right to a trial by jury would tend to destroy the flexibility of the juvenile judge as the trier of fact, which allows the judge to take into consideration social and psychological factors, family background, and education in order to shape the disposition in the best interest of both the child and society." Id. Thus, not only does the lack of a jury trial substantially further an appropriate governmental purpose, we have also found that granting that right would destroy that purpose.
In the instant case, the juvenile court judge erred in focusing narrowly on the specific role a jury might play during the adjudicative phase, rather than considering the rationale for separate treatment of juveniles as a whole, in concluding that withholding the right to a jury trial is unrelated to any rehabilitative purpose espoused by the stateprimarily because rehabilitative services are not generally available until the disposition phase.[52] However, *268 even if the juvenile court's approach is accepted, the court erred in ignoring the fact that the U.S. Supreme Court has already found that a jury's role as a fact finder in juvenile adjudications would not strengthen the fact finding process and would inhibit the juvenile court's ability to function in a unique manner.[53] Further, even as to the adjudicative phase, the juvenile court erred in finding that La.Ch.C. art. 882 is not reasonably related to concerns for speedy and less formal delinquency adjudications.[54] Moreover, in an *269 equal protection analysis in State v. Ferris, 99-2329 (La.5/16/00), 762 So.2d 601, this Court noted that in Manuel:
We further took judicial notice that all of the other states had enacted similar legislation raising the drinking age to twenty-one years to comply with the National Minimum Drinking Age Act, 23 U.S.C. § 158, observing: "Admittedly, those legislative decisions are not subject to the same equal protection scrutiny as the Louisiana statutes. Nevertheless, unanimous utilization of this approach to the problem is a significant indication that this approach `substantially furthers [the] appropriate state purpose . . . .'" 95-2189 (on reh'g) at p. 8, 692 So.2d at 341.
Ferris, 99-2329 at 7, 762 So.2d at 605. Thus, the juvenile court should have considered that nearly all other states do not allow jury trials in juvenile cases in considering whether this denial substantially furthered the state's purpose regarding juvenile proceedings. For all of the above reasons, the juvenile court erred in finding that the denial of jury trials in juvenile adjudications violated the equal protection clauses of the state and federal constitutions.

CONCLUSION
The United States Supreme Court has long declared that the lack of jury trials in juvenile adjudications does not violate due process. Reaffirming our prior ruling in Dino, we likewise determined seven years ago that the lack of jury trials did not violate due process in In re D.J. These rulings were based on the fundamental differences between criminal cases, in which the Sixth Amendment requires jury trials when the potential punishment is greater than six months, and juvenile adjudications. While A.J. argues that juvenile adjudications have become more akin to criminal prosecutions such that jury trials must now be allowed, there have been no statutory enactments since we last considered this issue in State ex rel. D.J., and other courts still almost universally reject the claim that juveniles have a constitutional right to trial by jury. Only the Kansas Supreme Court has ruled since State ex rel. D.J. that juveniles are entitled to a jury trial and that decision was based on that court's finding that the Kansas legislature had made dramatic changes to the law governing juvenile adjudications which made them equivalent to criminal prosecutions.
Further, although this Court has never decided this issue on equal protection grounds, we find that neither the federal nor state equal protection clauses provide for a right to trial by jury in juvenile adjudications. The United States Supreme Court has never upheld an equal *270 protection claim in a juvenile delinquency case, and although not decided on equal protection grounds, the ruling in McKeiver rests largely on the Court's determination that juvenile courts are legitimately distinct from adult criminal courts. Thus, we have serious reservations about whether the prerequisites can even be met for an equal protection analysis. But, even assuming that the equal protection clause provides the proper analytical framework, reasons abound in the jurisprudence that there is a rational basis for treating juveniles differently. Further, under a state equal protection analysis, treating juveniles on an individual basis with a focus on rehabilitation rather than retribution in an informal protective proceeding is an appropriate purpose, which purpose is substantially furthered by allowing a juvenile court judge, rather than a jury, to function as fact finder and shape the juvenile's disposition.
In conclusion, even when a juvenile is deprived of liberty in excess of six months, because a juvenile proceeding is distinct from criminal proceeding, neither the Sixth Amendment, nor the Due Process or Equal Protection Clauses of the United States or Louisiana Constitutions require that the juvenile be entitled to a trial by jury.

DECREE
For the foregoing reasons, the judgment of the Juvenile Court for the Parish of Orleans is reversed and the matter is remanded for further proceedings.
REVERSED AND REMANDED.
NOTES
[*] Judge Benjamin Jones, of the Fourth Judicial District, assigned as Justice Pro Tempore, participating in the decision.
[1] The petition lists six counts of aggravated rape against victim(s) identified only as "C.J." A.J. apparently has three siblings with the same initials. It appears that A.J. is accused of committing six aggravated rapes on two of those siblings.

According to stipulation, testimony, and documentary evidence, A.J.'s birth date is December 5, 1993. Therefore, A.J. turned 14 in the last month of the year during which he was alleged to have committed six aggravated rapes. . A.J.'s age at the time of the commission of the offenses is significant in determining the potential disposition he faces. Children's Code art. 897 provides a juvenile court with much discretion in the disposition after adjudication of felony-grade delinquent acts "other than those described in Article 897.1" See La.Ch.C. art. 897(A) ("After adjudication of any felony-grade delinquent act other than those described in Article 897.1 . . ."), (C) ("Except as provided in Article 897.1 . . ."), (D) ("Except as provided in Article 897.1. . ."), (E) ("Except as provided in Article 897.1 . . ."). In contrast, Article 897.1 requires a juvenile court to commit a child who is 14 years or older at the time of the commission of a felony-grade delinquent act based upon a violation of, inter alia, La. R.S. 14:42 (aggravated rape), to secure confinement until the child attains the age of 21. See La.Ch.C. art. 897.1(A). However, whether A.J. in fact faces a potential disposition under Article 897.1 cannot be determined definitively from the record. Although A.J. sought the exact times and dates of the offenses by bill of particulars, the state's response only referred him to police reports that are not in the record. In the record before this Court it is apparent only that the state alleges that the movant committed six aggravated rapes in calendar year 2007 and the movant turned 14 on the 5th day of the last month of that calendar year.
[2] In the motion, A.J. requested that the "Court grant him the right to have his case heard before a jury composed of six (6) jurors pursuant to Louisiana Code of Criminal Procedure Article 782". In the alternative, he asked that his adjudication be closed to the public. Finally, A.J. implied that he wished to challenge the sex offender registration law, La. R.S. 15:542(A)(3), by asking that "the possibility of registration be severed." Thereafter, the movant expanded upon this claim in memoranda, and a substantial dispute regarding the constitutionality of the sex offender registration law, La. R.S. 15:542(A)(3), appears in the record. However, A.J. did not prevail on any claim involving sex offender registration and the constitutionality of La. R.S. 15:542(A)(3) is therefore not before the Court at this time.
[3] More specifically, the movant complained that the following rules would apply: (1) juvenile proceedings involving certain violent felony-grade delinquent acts are open to the public under La.C.Ch. art. 879(B); and (2) a juvenile who is 14 years or older and who is adjudicated based on the felony-grade delinquent act of aggravated rape must be confined until he attains the age of 21 under La.Ch.C. art. 897.1(A) and shall be subject to the lifelong requirement that he register as a sex offender under La. R.S. 15:542(A)(3) and La. R.S. 15:544(B)(2)(b).
[4] Thus, the juvenile court noted that:

McKeiver was a consolidation of four juvenile cases in 1971: McKeiver himself was 16 when he and a group of 20 or more youths chased three teenage girls and took 25 cents from them, he had no prior record; Terry, aged 15, punched a police officer and hit him with a stick when the officer broke up a fight Terry was watching; Burus, along with 45 other children participating in a civil rights march, was charged with "impeding traffic"; Howard had been adjudicated delinquent for disturbing the peace at the principal's office at his elementary school and for defacing school furniture.. . .
Under Louisiana's current juvenile assessment and screening standards McKeiver, Burus, and Howard would have been eligible for pre-trial diversion and most likely never would have been petitioned in court for these charges. Terry would have been eligible for probation and community service.
But see A.C. v. People, 16 P.3d 240, 244 (Colo. 2001) (noting that "the juveniles in McKeiver did face a penalty of potential loss of freedom for over six months").
[5] The juvenile court noted that:

Louisiana's Children's Code bifurcates a delinquency proceeding into two separate phases: the adjudication hearing (Ch.C. Art. 877, et seq.) and the disposition hearing (Ch.C. Art. 892, et seq.). The two phases appear in separate chapters of the delinquency title and are governed by different time lines, rules of evidence, and guidelines. . . .
Of the elements Blackmun cited [in McKeiver], only two relate to the defendant and only one could reasonably be said to concern the adjudication phase. The other five are about juvenile court as an institution or the disposition phase, specifically, the means and tools available to the court to craft a disposition that "meets the needs of the youth." As a jury trial is not applicable to the disposition phase, Blackmun's factors shed little light on how a jury trial may be less essential to protecting the accused's rights in a juvenile adjudication.
[6] The court outlined the test as follows:

(1) Whether the right asserted was historically part of fundamental fairness.
(2) Whether giving the particular right in question to the juvenile offender would hamper any of the beneficial aspects of a juvenile proceeding.
(3) Whether the right in question is both "fundamental" and "essential," in that it performs a function too important to sacrifice in favor of benefits afforded by the civil-style juvenile proceeding.
(citing In re C.B., supra, and In the Interest of Causey, 363 So.2d 472 (La. 1978)).
[7] These conclusions are based largely on a strong division between the adjudication and disposition phases of juvenile proceedings:

Given the statutory separation of the adjudication phase from the dispositional phase, and the fact that the rehabilitative and treatment services only become available to a juvenile defendant after a judgment of disposition, and not at or during the adjudication hearing, it is hard to see any important aim or beneficial aspect of the juvenile court system that is thwarted by affording jury trials to juveniles.
[8] Specifically, the juvenile court rejected the state's assertions that denying juveniles the right to a jury trial substantially furthers the following purposes: (1) treating and rehabilitating juveniles; and (2) shielding juveniles from the adult criminal justice system. As in the preceding sections, the juvenile court found that the causal connection between the denial of the right and the furthering of the state's purposes was not established:

Thus, a jury trial does not impact, effect or change either the nature or number of the treatment and rehabilitative services available for a juvenile; nor does it affect the ability of the juvenile to receive and benefit from such services.
. . . A jury trial in a delinquency proceeding would have no impact-negatively or positivelyon protecting a juvenile from the criminal justice system.
The asserted government purpose is not implicated by the classification at all.
[9] The Duncan court characterized this test as follows:

The test for determining whether a right extended by the Fifth and Sixth Amendments with respect to federal criminal proceedings is also protected against state action by the Fourteenth Amendment has been phrased in a variety of ways in the opinions of this Court. The question has been asked whether a right is among those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," Powell v. State of Alabama, 287 U.S. 45, 67, 53 S.Ct. 55, 63, 77 L.Ed. 158 (1932); whether it is "basic in our system of jurisprudence," In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948); and whether it is "a fundamental right, essential to a fair trial," Gideon v. Wainwright, 372 U.S. 335, 343-344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963); Malloy v. Hogan, 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653 (1964); Pointer v. State of Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965). The claim before us is that the right to trial by jury guaranteed by the Sixth Amendment meets these tests. The position of Louisiana, on the other hand, is that the Constitution imposes upon the States no duty to give a jury trial in any criminal case, regardless of the seriousness of the crime or the size of the punishment which may be imposed. Because we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which-were they to be tried in a federal court-would come within the Sixth Amendment's guarantee. Since we consider the appeal before us to be such a case, we hold that the Constitution was violated when appellant's demand for jury trial was refused.
Duncan, 391 U.S. at 148-49, 88 S.Ct. at 1447-48 (footnotes omitted).
[10] For example, the Court stated:

While there can be no doubt of the original laudable purpose of juvenile courts, studies and critiques in recent years raise serious questions as to whether actual performance measures well enough against theoretical purpose to make tolerable the immunity of the process from the reach of constitutional guaranties applicable to adults. There is much evidence that some juvenile courts, including that of the District of Columbia, lack the personnel, facilities and techniques to perform adequately as representatives of the State in a parens patriae capacity, at least with respect to children charged with law violation. There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.
Kent, 383 U.S. at 555-56, 86 S.Ct. at 1054 (footnote omitted).
[11] See Kent, 383 U.S. at 556, 86 S.Ct. at 1054-55 (noting that the Court would not "rule that constitutional guaranties which would be applicable to adults charged with the serious offenses for which Kent was tried must be applied in juvenile court proceedings. . . [because the] Juvenile Court Act and the decisions of the United States Court of Appeals for the District of Columbia Circuit provide an adequate basis for decision of this case, . . . .").
[12] See United States v. Doe, 385 F.Supp. 902, 903 (D.C.Ariz.1974) ("most state courts found that the right to jury trial was not among the list of procedural requirements imposed upon the states by the due process clause . . . however, Gault, was interpreted [in some states] to require a jury trial in any case where the defendant was charged with conduct which would be criminal if he were an adult").
[13] The McKeiver Court addressed Duncan as follows:

The right to an impartial jury "[i]n all criminal proceedings" under federal law is guaranteed by the Sixth Amendment. Through the Fourteenth Amendment that requirement has now been imposed upon the States "in all criminal cases which-were they to be tried in a federal court-would come within the Sixth Amendment's guarantee." This is because the Court has said it believes "that trial by jury in criminal cases is fundamental to the American scheme of justice." Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968); Bloom v. Illinois, 391 U.S. 194, 210-211, 88 S.Ct. 1477, 1486-1487, 20 L.Ed.2d 522 (1968).
This, of course, does not automatically provide the answer to the present jury trial issue, if for no other reason than that the juvenile court proceeding has not yet been held to be a "criminal prosecution," within the meaning and reach of the Sixth Amendment, and also has not yet been regarded as devoid of criminal aspects merely because it usually has been given the civil label. Kent, 383 U.S. at 544, 86 S.Ct. at 1054; Gault, 387 U.S. at 17, 49-50, 87 S.Ct. at 1438, 1455-1456; Winship, 397 U.S. 358, 365-366, 90 S.Ct. 1068, 1073-1074, 25 L.Ed.2d 368.
. . . The Court specifically has recognized by dictum that a jury is not a necessary part even of every criminal process that is fair and equitable. Duncan v. Louisiana, 391 U.S., at 149-150, n. 14, and 158, 88 S.Ct., at 1447, and 1452.
McKeiver, 403 U.S. at 540-41, 547, 91 S.Ct. at 1984, 1987. This Court previously discussed the interplay of Duncan and McKeiver as follows:
While the due process right to a jury trial has been held to be an element of "fundamental fairness," at least in non-petty adult proceedings, Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the court's emphasis in McKeiver was not on the degree of "fundamentality," but on the function served by the jury trial. The plurality saw the jury as a component in the factfinding process, and as such, not "a necessary component of accurate factfinding." 403 U.S. at 543, 91 S.Ct. at 1985. Only after finding that the jury trial although "fundamental" for adults was not really "essential" to a fair trial proceeding, i.e., did not perform a function that could not be adequately performed by some other procedure, did the court examine the impact of a jury trial upon the beneficial effects of the juvenile system, and conclude that it would "bring with it into that system the traditional delay, the formality, and the clamor of the adversary system and, possibly, the public trial." Id. at 550, 91 S.Ct. at 1988.
State ex rel. Causey, 363 So.2d 472, 474-75 (La. 1978).
[14] The criticisms marshaled against McKeiver in the instant case for the most part mirror those that first appeared when it was freshly decided. See generally The Supreme Court, 1970 Term, Jury Trials in Juvenile Proceedings, 85 Harv. L.Rev. 113 (1971). For example, the commentator criticizes the McKeiver court for failing to:

. . . recognize that the impact of the jury on the juvenile system, whatever its magnitude, would be limited to the adjudicative stage of the proceedings. It would not affect the informality of pretrial proceedings which often obviate the need for adjudicative hearings. Nor would it affect the dispositional stage, where the sole function could still be concern for juvenile rehabilitation. The judge, who exercises a key role in the dispositional stage, would retain broad discretionary powers to formulate a remedy, considering the nature of the offense, the recommendations of social and psychiatric personnel, the age of the child and the individual needs of the child and his guardians.
85 Harv. L.Rev. at 119-20.
[15] The Supreme Court has cited McKeiver 12 times (including concurrences and dissents) without criticism and has given no indication that its holding is no longer viable. Despite the unpopularity of McKeiver with commentators, see, e.g., Cart Rixey, The Ultimate Disillusionment: The Need for Jury Trials in Juvenile Adjudications, 58 Cath. U.L.R. 885 (2009) (advocating the abandonment of McKeiver as outdated), it has only been cited negatively in 6 published decisions. In contrast, its positive citations in the jurisprudence numbers in the hundreds. Furthermore, despite some ebb and flow in the Court's jurisprudence in this area, see generally Ellen Marrus, "That Isn't Fair, Judge": The Costs of Using Prior Juvenile Delinquency Adjudications in Criminal Court Sentencing, 40 Hou. L.Rev. 1323, 1337-39 (2004), the most recent statement from the Court has reiterated that criminal prosecutions and juvenile proceedings are "fundamentally different." See Schall v. Martin, 467 U.S. 253, 263, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984).
[16] See State ex rel. D.J., supra at 35 (Calogero, C.J., concurring).

I concur in the majority opinion that due process does not require the State to provide jury trials to juveniles; that issue has already been decided by the United States Supreme Court in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). If juveniles are to be afforded a trial by jury it is not going to be through this court's construing that right as constitutionally mandated by due process, but by the legislature's making a statutory change which is within their power.
Former Chief Justice Calogero's comment was in line with McKeiver's holding that:
If, in its wisdom, any State feels the jury trial is desirable in all cases, or in certain kinds, there appears to be no impediment to its installing a system embracing that feature. That, however, is the State's privilege and not its obligation.
McKeiver, 403 U.S. at 547, 91 S.Ct. at 1987.
[17] This Court recently found error in a district court's preemptive rejection of another Supreme Court plurality opinion:

Due to this Court's prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination [in the plurality opinion of Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972)] that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
State v. Bertrand, 08-2215 (La.3/17/09), 6 So.3d 738, 743.
The juvenile court also erred by not affording La.Ch.C. art. 882 the presumption of constitutionality. Statutes are generally presumed to be constitutional and the party challenging the validity of the statute bears the burden of proving it is unconstitutional. State v. Fleury, 01-0871 (La. 10/16/01), 799 So.2d 468, 472; State v. Brenner, 486 So.2d 101, 102 (La. 1986); State v. Rones, 223 La. 839, 67 So.2d 99, 105 (1953).
[18] See, e.g., United States v. Doe, 385 F.Supp. 902, 904 (D.Ariz.1974) ("there can be no doubt, in light of McKeiver, that the Sixth Amendment does not require a jury trial in federal juvenile delinquency proceedings"); People v. A.C., 991 P.2d 304, 306-07 (Colo. App.2000) ("The problem with A.C.'s argument, as applied to the federal constitution, is that the United States Supreme Court in McKeiver v. Pennsylvania, supra, expressly declined to `inject' the right to a jury into state juvenile proceedings.").
[19] La. Const. art. 1, § 2 provides that:

No person shall be deprived of life, liberty, or property, except by due process of law.
This language closely tracks the federal provision and in In re C.B., we applied the federal "fundamental fairness" standard in deciding "whether a particular safeguard in a juvenile delinquency adjudication is required in order to satisfy the `essentials of due process and fair treatment' found in Article I, § 2 of our constitution." Thus, this Court framed the appropriate test as follows:
In determining which due process rights are guaranteed to juveniles by the Louisiana Constitution, this Court has adopted the case-by-case analysis of juvenile proceedings employed by the United States Supreme Court. Causey, 363 So.2d at 474; See [In re] Banks, 402 So.2d 690 [(La. 1981)]; In re Batiste, 367 So.2d 784 (La. 1979); In re Dino, 359 So.2d 586 (La. 1978). Under this analysis, an attempt is made to "strike a judicious balance by injecting procedural orderliness into the juvenile court system . . . to reverse the trend whereby `the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.'" McKeiver, 403 U.S. at 545, 91 S.Ct. at 1986 (quoting Kent v. United States, 383 U.S. 541, 556, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966)). In so doing, an inquiry is made into whether the right asserted was historically part of fundamental fairness and whether giving the particular right in question to the juvenile offender would hamper any of the beneficial aspects of a juvenile proceeding. Causey, 363 So.2d at 474 (citing McKeiver, supra; Winship, supra; Gault, supra). Accordingly, this Court noted that, "Only those rights that are both `fundamental' and `essential,' in that they perform a function too important to sacrifice in favor of the benefits afforded by the civil-style juvenile proceeding, have been held to be required in such proceedings." Causey, 363 So.2d at 474.
In re C.B., supra at 397-98.
[20] Regarding this factor, we stated:

In fact, in McKeiver, on which Dino was based, the United States Supreme Court "focused on the role of the jury as a `factfinder,'. . . and noted that the imposition of a jury trial would not `strengthen greatly, if at all, the factfinding function, and would, contrarily, provide an attrition of the juvenile court's assumed ability to function in a unique manner.'" Id. (Citing McKeiver, supra, 403 U.S. at 547, 91 S.Ct. 1976). Indeed, affording juvenile offenders the right to trial by jury would tend to destroy the flexibility of the juvenile judge as the trier of fact, which allows the judge to take into consideration social and psychological factors, family background, and education in order to shape the disposition in the best interest of both the child and society.
State ex rel. D.J., supra at 33 (footnote omitted).
[21] We explained the disparity in that case as follows:

Further, notwithstanding the changes in the juvenile justice system discussed above, there remains a great disparity in the severity of penalties faced by a juvenile charged with delinquency and an adult defendant charged with the same crime. In fact, if the court adjudicated the juvenile in the instant case delinquent, he would face a maximum sentence of eight years detention while the court would retain the discretion to sentence him to a lighter term. La.Ch.C. art. 897; La.Ch.C. art. 897.1. An adult defendant convicted of the identical charge would face a maximum sentence of 55 years imprisonment at hard labor, 50 years without benefit of parole, probation or suspension of sentence. La. R.S. 14:27 (La. R.S. 14:30.1); La. R.S. 14:95.2.
State ex rel. D.J., supra at 33 (footnote omitted).
[22] Thus, we stated:

Further, despite the criticism of McKeiver by some commentators, the vast majority of the jurisdictions which have examined the issue have determined that such a right is not guaranteed by the Due Process Clause. Challenges, like the instant one, claiming that fundamental changes in the nature of the juvenile justice system have undermined the validity of the McKeiver Court's analysis have been routinely rejected. See e.g., United States v. C.L.O., 77 F.3d 1075, 1077 (8th Cir.1996), cert. denied, 518 U.S. 1027, 116 S.Ct. 2570, 135 L.Ed.2d 1086 (1996) (noting that "[m]ore than a decade after the McKeiver decision," in Schall v. Martin, 467 U.S. 253, 263, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984), "the Supreme Court cited McKeiver approvingly. . . ."); Valdez v. State, 33 Ark.App. 94, 801 S.W.2d 659, 661 (1991) (due process standard of fundamental fairness maintained by enactment of Arkansas Juvenile Code without affording a jury trial); see also State ex rel. Juvenile Dep't of Klamath County v. Reynolds, 317 Or. 560, 857 P.2d 842, 845-50 (1993); State v. Schaaf, 109 Wash.2d 1, 743 P.2d 240, 245-47 (1987).
State ex rel. D.J., supra at 34.
[23] In re C.B., supra at 400.
[24] See e.g., Janet E. Ainsworth, Youth Justice in a Unified Court: Response to Critics of Juvenile Court Abolition, 36 B.C. L.Rev. 927, 942-44 (1995) (addressing the "single most serious procedural infirmity of the juvenile court-its lack of jury trials. . . .").
[25] See e.g., United States v. Juvenile Male C.L.O., 77 F.3d 1075, 1077 (8th Cir.1996) (noting that "[m]ore than a decade after the McKeiver decision," in Schall v. Martin, 467 U.S. 253, 263, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984), "the Supreme Court cited McKeiver approvingly. . . ."); Valdez v. State, 33 Ark. App. 94, 801 S.W.2d 659, 661 (1991) (due process standard of fundamental fairness maintained by enactment of Arkansas Juvenile Code without affording a jury trial); see also State ex rel. Juvenile Dep't v. Reynolds, 317 Or. 560, 857 P.2d 842, 845-50 (1993); State v. Schaaf, 109 Wash.2d 1, 743 P.2d 240, 245-47 (1987).
[26] See State v. Lord, 117 Wash.2d 829, 822 P.2d 177, 215-16 (1992); Reynolds, supra, 857 P.2d at 849-50.
[27] See, e.g., United States ex rel. Murray v. Owens, 465 F.2d 289, 293-94 (2d Cir.1972); In re Myresheia W., 61 Cal.App.4th 734, 72 Cal.Rptr.2d 65, 69 (1998).
[28] See, e.g., In re T.M., 742 P.2d 905, 911-12 (Colo. 1987) (rejecting argument that equal protection clauses of federal and state constitutions require that juveniles be afforded the same right to jury trial as adult criminal defendants); Schaaf, supra (rejecting argument that the strict scrutiny test applies to juvenile proceedings because juveniles are not a suspect class and because right to a jury is not a fundamental right).
[29] See generally Annotation, Right to Jury Trial in Juvenile Court Delinquency Proceedings, 100 A.L.R.2d 1241 (1965 & supp.1997) (summarizing the law in several jurisdictions regarding juveniles' right to a jury trial).
[30] See, e.g., Ala.Code § 12-15-129(a); D.C.Code § 16-2316(a); Fla. Stat. Ann. § 985.35(2); Ga.Code Ann. § 15-11-41(a); Haw.Rev.Stat. § 571-41(a); Idaho Code § 20-519, Juv. R., Rule 10; Ind.Code Ann. § 31-32-6-7(a); Ky.Rev.Stat. Ann. § 610.070(1); La. Children's Code Ann. arts. 664, 882; Miss.Code Ann. § 43-21-203(3); Neb.Rev.Stat. § 43-279(1); Nev.Rev.Stat. Ann. § 62D.010(1)(c); N.J. Stat. Ann. § 2A:4A-40; N.D. Cent.Code § 27-20-24(1); Ohio Rev.Code Ann. § 2151.35(A); Or.Rev. Stat. § 419C.400(1); Pa. C.S.A. tit. 42, § 6336(a); S.C.Code § 63-3-590; Tenn.Code Ann. § 37-1-124(a); Utah Code Ann. § 78A-6-114(1); Wash. Rev.Code Ann. § 13.04.021(2); Wis. Stat. Ann. § 938.31(2); Robinson v. State, 227 Ga. 140, 179 S.E.2d 248 (1971); In re Fucini, 44 Ill.2d 305, 255 N.E.2d 380 (1970); Bible v. State, 253 Ind. 373, 254 N.E.2d 319 (1970); Dryden v. Com., 435 S.W.2d 457 (Ky.1968); In re Johnson, 254 Md. 517, 255 A.2d 419 (1969); In re Fisher, 468 S.W.2d 198 (Mo.1971); In re Hans, 174 Neb. 612, 119 N.W.2d 72 (1963); In re State in Interest of J. W., 57 N.J. 144, 270 A.2d 273 (1970); In re Burrus, 275 N.C. 517, 169 S.E.2d 879 (1969), aff'd, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971); In re D., 27 N.Y.2d 90, 313 N.Y.S.2d 704, 261 N.E.2d 627 (1970); In re Agler, 19 Ohio St.2d 70, 249 N.E.2d 808 (1969); State v. Turner, 253 Or. 235, 453 P.2d 910 (1969); In re Terry, 438 Pa. 339, 265 A.2d 350 (1970), aff'd, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971); In re McCloud, 110 R.I. 431, 293 A.2d 512 (1972); Estes v. Hopp, 73 Wash.2d 263, 438 P.2d 205 (1968); see also State in Interest of T.B., 933 P.2d 397 (Utah Ct.App.1997) (neither federal nor state constitutional guarantees of due process of law provide right to jury trial for mother in termination of parental rights proceeding in juvenile court); In re G.O., 191 Ill.2d 37, 245 Ill.Dec. 269, 727 N.E.2d 1003 (2000) (revised statutory scheme providing for jury trial in habitual juvenile offender cases and violent juvenile offender cases but not providing for it in cases in which juvenile is charged with first-degree murder does not violate due process or equal protection). But see In Interest of Hezzie R., 219 Wis.2d 848, 580 N.W.2d 660 (1998) (statute eliminating jury trials generally in juvenile proceedings is constitutionally valid; however, in cases in which juveniles adjudicated delinquent potentially are subject to incarceration in adult correctional facilities, juveniles are entitled to constitutional right to jury trial).
[31] See, e.g., Colo.Rev.Stat. § 19-2-107 (right to jury trial in aggravated juvenile offender cases; no jury trial in cases involving minor offenses; discretionary in all other cases); Kan. Stat. Ann. § 38-2357 (court has discretion to order jury trial in case of child charged with felony); Mass. Gen. Laws Ann. ch. 119, § 55A; Mich. Comp. Laws Ann. § 712A.17(2); Mont.Code Ann. § 41-5-1502(1); N.M. Stat. Ann. § 32A-2-16(A); Okla. Stat. Ann. tit. 10, § 7303-4.1; Tex. Fam.Code Ann. § 54.03(c); W. Va.Code § 49-5-6; Wyo. Stat. Ann. § 14-6-223(c); RLR v. State, 487 P.2d 27 (Alaska 1971); see also Ark. Stat. Ann. §§ 9-27-325(a), 9-27-505(a) (jury trial generally not allowed, but allowed in extended jurisdiction juvenile proceeding); Ill. Comp. Stat. Ann. ch. 705, §§ 405/5-605(1), 405/5-810(3), 405/5-815(d), 405/5-820(d) (no provision generally made for jury trial in delinquency proceedings, but jury trial allowed in proceedings designated an extended jurisdiction juvenile prosecution and in cases in which the juvenile is alleged to be an habitual juvenile offender or violent juvenile offender); Minn.Stat. Ann. § 260B.163(1)(a) (jury trials generally not allowed, but jury trial allowed in case of "extended jurisdiction juvenile" as defined in § 260B.130(1)).
[32] In contrast, Alaska refused to find any right to a jury trial in juvenile proceedings under the federal constitution but instead found such a right guaranteed by the Alaska constitution, at least in those delinquency proceedings that are based on allegations of criminal conduct that, if committed by an adult, could result in incarceration. See I.J. v. State, 182 P.3d 643 (Alaska Ct.App.2008).
[33] The Kansas constitution guarantees the right to a jury trial in all "prosecutions". Kan. Const. Bill of Rights § 10. In 1984, Kansas changed the KJJC to replace "juvenile adjudication" with "prosecution". See In re L.M., 186 P.3d at 172; see also Kan. Stat. Ann. § 38-2303(c), (d); 38-2304(e)(2); 38-2346(a), (b)(1); 38-2350.
[34] Kansas ruled that juveniles in that jurisdiction have a constitutional right to a jury trial both under the Kansas constitution and the U.S. constitution via the Sixth and Fourteenth Amendments. The consequences of that ruling have been described by one commentator as follows:

The decision sent shockwaves through the Kansas juvenile justice system and left county officials, judges, attorneys, and legislators scrambling to determine the effects of the opinion.
Andrew Treaster, Juveniles in Kansas Have a Constitutional Right to a Jury Trial. Now What? Making Sense of In re L.M., 57 U. Kan. L.Rev. 1275 (2009).
[35] Specifically, the court noted that the purpose statement of the Kansas Juvenile Justice Code was revised to shift from the prior Kansas Juvenile Offender Code's former emphasis on rehabilitation to "protecting the public, holding juveniles accountable for their behavior and choices, and making juveniles more productive and responsible members of the society." In re L.M., 186 P.3d at 168. The court also noted that the legislature had adopted a sentencing matrix that made juvenile punishments comparable to those of adults. See id. at 168-69. Thus, the court concluded that:

[B]ecause the juvenile justice system is now patterned after the adult criminal system, we conclude that McKeiver and Findlay Courts' reasoning and those decisions are no longer binding precedent for us to follow.
Id. at 170.
[36] See Ellen Marrus, Best Interests Equals Zealous Advocacy: A Not So Radical View of Holistic Representation for Children Accused of Crime, 62 Md. L.Rev. 288, 293 n. 20 (2003); see also Ellen Marrus, "That Isn't Fair, Judge": The Costs of Using Prior Juvenile Delinquency Adjudications in Criminal Court Sentencing, 40 Hou. L.Rev. 1323, 1356 (2004) (noting that "[o]nly Justice Black, in his opinion in Gault, said that delinquents in juvenile court were being deprived of the Bill of Right's guarantees and found that that deprivation violated equal protection").
[37] In Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), the Court recognized that the "acceptance of juvenile courts distinct from the adult criminal justice system assumes that juvenile offenders constitutionally may be treated differently from adults."
[38] See, e.g., In Interest of Hezzie R., supra at 678.
[39] See, e.g., In re R.C., 39 Cal.App.3d 887, 895, 114 Cal.Rptr. 735, 740 (1974).
[40] In fact, the separate treatment of juvenile offenders is established in Article 5, § 19 of the Louisiana constitution, which provides in part:

The determination of guilt or innocence, the detention, and the custody of a person who is alleged to have committed a crime prior to his seventeenth birthday shall be pursuant to special juvenile procedures which shall be provided by law.
This provision grants the legislature much discretion in the treatment of a person under seventeen who has been charged with any of the enumerated serious offenses. See State v. Pilcher, 27,085 (La.App. 2 Cir. 5/10/95), 655 So.2d 636, 639, writ denied, 95-1481 (La. 11/13/95), 662 So.2d 466; see also Lee Hargrave, The Louisiana Constitution: A Reference Guide 25 (1991) (noting that even the constitution draws several lines based on age).
[41] These determinations again typically demonstrate this interplay between due process, McKeiver, and the equal protection analysis:

However, because we hold that a jury trial is not a fundamental right for juveniles in delinquency proceedings, an equal protection violation occurs only if the legislative classification is unreasonable and bears no rational relationship to legitimate state objectives. T.M., 742 P.2d at 911.
A.C. v. People, 16 P.3d 240, 245 (Colo.2001).
[42] McKeiver, 403 U.S. at 545, 91 S.Ct. at 1986.
[43] McKeiver, 403 U.S. at 547, 91 S.Ct. at 1987.
[44] The juvenile court judge, however, formulated the problem differently. The juvenile court judge found that the right to a jury trial was extended to all persons by Article 1, § 17 of the state constitution and then arbitrarily withdrawn from juveniles by operation by La. Ch.C. art. 882. Because this constitutional provision applies to criminal trials, this line of reasoning requires an assumption that juvenile and criminal proceedings have become indistinguishable, which this Court has rejected at this time, as discussed above. Without this assumption, the reasoning fails before even reaching the question of reasonableness.
[45] New York v. Ferber, 458 U.S. 747, 756-57, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982) (quoting Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982)).
[46] Ferber, 458 U.S. at 756-57, 102 S.Ct. at 3354.
[47] See, e.g., In the matter of Cundiff, 2000 WL 28845 *4 (Ohio App.2000) ("We conclude that the fact the legislature has by statute denied juveniles the right to a jury trial is rationally related to the purpose of preserving this `separate avenue for dealing with minors.'"); see also In Interest of Hezzie R., supra; State v. Schaaf, 109 Wash.2d 1, 743 P.2d 240 (1987); DeBacker v. Sigler, 185 Neb. 352, 175 N.W.2d 912 (1970); In re Presley, 47 Ill.2d 50, 264 N.E.2d 177 (1970).
[48] Bd. of Comm'rs of N. Lafourche Conservation, Levee & Drainage Dist. v. Bd. of Comm'rs of Atchafalaya Basin Levee Dist., 95-1353 (La.1/16/96), 666 So.2d 636, 639.
[49] Id. Moreover, this Court has consistently held that legislative enactments are presumed valid and their constitutionality should be upheld when possible. State v. Caruso, 98-1415 (La.3/2/99), 733 So.2d 1169, 1170 (citing State v. Griffin, 495 So.2d 1306, 1308 (La. 1986)).
[50] Manuel, supra at 339 (citing Sibley) (state constitution calls for more rigorous scrutiny than federal constitutional analysis). In Manuel, the Court upheld against an equal protection challenge laws raising the minimum drinking age from 18 to 21 years.
[51] Manuel, supra at 340.
[52] The juvenile court judge's narrow focus is atypical. In fact, one court specifically rejected a piecemeal approach to parsing out the distinctions between the adult and juvenile systems. See State v. Morales, 240 Conn. 727, 694 A.2d 758, 764-65 (1997). Other jurisdictions as well have preferred to focus on the distinct nature of the juvenile justice system as a whole when considering whether a rationale is sufficient to meet minimal scrutiny. See, e.g., State v. J.H., 96 Wash.App. 167, 978 P.2d 1121, 1131 (1999) ("Because the juvenile justice provisions as amended still retain significant differences from the adult criminal justice system and still afford juveniles special protections not offered to adults, then, under the rational relationship test, RCW 13.04.021(2) does not violate the equal protection guarantees of the state and federal constitutions."); State v. Schaaf, 109 Wash.2d 1, 743 P.2d 240, 250 (1987) ("We conclude that the Legislature's statutory denial of jury trials to juveniles is rationally related to its desire to preserve some of the unique aspects of the juvenile court system.").
[53] See, e.g., A.C. v. People, 16 P.3d 240, 245 (Colo.2001) ("It is rational to provide a "less formal and adversarial setting for certain classes of juvenile suspects" because the juvenile system seeks to provide juveniles with care and guidance."). Nor are concerns for speedy and informality wholly distinct from rehabilitative goals. See, e.g., J.T. v. O'Rourke, 651 P.2d 407, 412 n. 5 (Colo. 1982) (noting that "The juvenile system is premised on the concept that a more informal, simple, and speedy judicial setting will best serve the needs and welfare of juvenile defendants"). Other courts have found a link between the speed and informality of the delinquency adjudication and its rehabilitative efficacy as well:

In enacting the JJC, the JJSC and the legislature expressed concerns about negating delays in the juvenile justice system. The JJSC recommended that "[t]he system should operate more efficiently through streamlining of processes and improved access to information by entities that work with juvenile delinquents." JJSC Report at 7 (emphasis supplied). This concern is also evidenced in Wis. Stat. § 938.01(2)(e), which states that one of the purposes of the JJC is "[t]o divert juveniles from the juvenile justice system through early intervention. . ." (Emphasis supplied).
This desire for immediate intervention bears a "reasonable and practical" relationship to the legislature's desire to rehabilitate and treat juvenile offenders and protect the public. McManus, 152 Wis.2d at 131, 447 N.W.2d 654. Similar language is not found in Wis. Stat. chs. 48, 51, 55, and 980. The distinct nature of juvenile delinquency proceedings and the objectives of the legislature evince that there is a "rational basis" for attempting to streamline the proceedings by not affording juveniles the right to a jury trial.
The objectives of the Wisconsin Legislature for immediate intervention were objectives recognized by the United States Supreme Court in McKeiver, 403 U.S. at 550, 91 S.Ct. 1976, 29 L.Ed.2d 647, when the Court stated that, if a jury trial "were injected into the juvenile court system as a matter of right, it would bring with it into that system the traditional delay, the formality and the clamor of the adversary system.". . .
It is this court's responsibility to attempt to locate a rationale for the legislature's classification that "reasonably upholds the legislative determination." Castellani, 218 Wis.2d at 264, 578 N.W.2d at 175. Based upon the legislature's stated objectives in the JJC, and other persuasive authority cited herein, we conclude that the need for early intervention in the JJC is a reasonable basis for requiring that the trier of fact in a juvenile delinquency proceeding be the juvenile court judge. Accordingly, we conclude that the juveniles' rights guaranteed under the equal protection clauses of the Wisconsin and United States Constitutions have not been violated.
In Interest of Hezzie R., 580 N.W.2d at 677-78.
[54] Kansas's recent decision in In re L.M. has been criticized for disregarding these same concerns:

The first and most glaring policy consideration that must be acknowledged is the decreased efficiency that jury trials, particularly a substantial number of jury trials, will bring to the juvenile justice system. In adjudicating juveniles, there is a concern for quick resolution beyond merely the juvenile's obvious interest. In particular, parents have a vested interest because their parental rights hang in the balance. Additionally, the state desires a quick resolution to ensure that rehabilitation is effective. Unfortunately, jury trials will take longer. On average, a felony jury trial takes between two and four days, with the time required to pick a jury accounting for twenty to thirty-five percent. In contrast, a bench trial takes about one day. Furthermore, jury trials require more preparation time, which will result in higher costs for the prosecution, court-appointed attorneys, and juveniles and their families. Moreover, courts will be forced to endure added time for voir dire and jury deliberations. These concerns are very real. Courts in Shawnee County received dozens of requests for jury trials in the first three months after the L.M. ruling, and courts in Sedgwick County plan to accommodate up to 100 new juvenile trials a year. Such volume and potential for decreased efficiency is a strong argument to seriously consider the number of trials that would be expected at each potential threshold.
Andrew Treaster, Juveniles in Kansas Have a Constitutional Right to a Jury Trial. Now What? Making Sense of In re L.M., 57 U. Kan. L.Rev. 1275, 1293 (2009).